1   WO

2

3

4

5                    IN THE UNITED STATES DISTRICT COURT

6                    FOR THE DISTRICT OF ARIZONA

7

8   Isadore Baptisto,                    )    No. CV-03-1393-PHX-SRB
                                         )
9            Plaintiff,                   )    **ORDER**
                                         )
10  vs.                                  )
                                         )
11                                       )
    Charles Ryan, et al.,                )
12                                       )
             Defendant.                  )
13                                       )
                                         )
14                                       )
    _____ )
15
16  Christian Diaz,                      )    No. CV-03-1498-PHX-SRB
                                         )
17           Plaintiff,                   )
                                         )
18  vs.                                  )
                                         )
19                                       )
    Dora Schriro, et al.                 )
20                                       )
             Defendants.                 )
21                                       )
    _____ )
22
23  T.C. Mullins,                        )    No. CV-02-1056-PHX-SRB
                                         )
24           Plaintiff,                   )
                                         )
25  vs.                                  )
                                         )
26                                       )
    Terry L. Stewart, et al.             )
27                                       )
             Defendants.                 )
28  _____ )

Plaintiffs are inmates in the custody of the Arizona Department of Corrections ("ADOC") and are housed in Special Management Unit 2 ("SMU-2"), a maximum security prison in Florence, Arizona reserved for, among others, death row inmates, inmates with the highest security classifications, and validated members of Security Threat Groups ("STGs"), also known as prison gangs.  Plaintiffs, all of whom have represented themselves throughout this litigation, separately filed civil rights complaints pursuant to 42 U.S.C. § 1983, alleging that the conditions of their confinement in SMU-2 violate the Eighth Amendment's prohibition on cruel and unusual punishment.  At the summary judgment stage, the Court dismissed certain aspects of each of the three complaints, and allowed others to proceed to trial.  The Court concluded that as to two conditions of confinement, material issues of fact remained with respect to all three complaints: the adequacy of the in-cell lighting and the sufficiency of the outdoor exercise and exposure to fresh air and sunlight.  Plaintiff Isadore Baptisto was permitted to proceed to trial with respect to a third condition of his confinement: the sufficiency of his diet.

Because of the similarity of the three cases, the Court tried them together.  Beginning on February 22, 2005, the Court conducted a three-day bench trial.  Having considered the evidence received at the trial, together with the arguments of counsel, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

**The Plaintiffs**

1.     Plaintiffs are inmates in the custody of the ADOC.  They are housed in SMU-2, an Arizona State Prison located in Florence, Arizona.  SMU-2 is considered a Supermax facility.[1]

---

[1]The National Institute of Corrections defines a Supermax prison as, "[a] freestanding facility, or a distinct unit within a freestanding facility, that provides for the management and secure control of inmates who have been officially designated as exhibiting violent or seriously disruptive behavior while incarcerated.  Such inmates have been determined to be a threat to safety and security in traditional high-security facilities and their behavior can be controlled only by separation, restricted movement, and limited access to staff and other

2.      Plaintiffs are confined in SMU-2 because of their validation as members of STGs. Plaintiff T.C. Alyne Mullins was validated as a member of the Aryan Brotherhood in 1999; Plaintiff Christian Diaz was validated as a member of Sureños in 2001; and Baptisto was validated as a member of the Warrior Society in 2002. All three prison gangs meet the ADOC's definition of an STG. Plaintiffs were transferred to SMU-2 within several months of their validation.

3.      Plaintiffs filed actions pursuant to 42 U.S.C. § 1983 alleging that the conditions of their confinement in SMU-2 constitute cruel and unusual punishment. In particular, Plaintiffs allege that their cells are illuminated for 24 hours per day, preventing sleep and causing psychological trauma. Plaintiffs also allege that the three hours of "outdoor exercise" that they are allotted each week is insufficient, both because of the minimal number of hours and because the "exercise" is not truly "outdoors," but occurs in what they allege to be essentially a cell with a mesh ceiling.[2] In addition, Baptisto alleges that the prison diet has caused him to become malnourished, resulting in the loss of seventy-five pounds.

**Life in SMU-2 for STG-Validated Inmates**

4.      While only three conditions of confinement were at issue in this trial, an overview of other conditions in SMU-2 for validated STG members is useful for background purposes.

5.      Inmates in SMU-2, of which there an average of 650 at any moment,[3] are confined in isolation. Each inmate has his own cell and while an inmate may communicate with

---

inmates." *Austin v. Wilkinson,* 189 F. Supp.2d 719, 722 n.2 (N.D. Ohio 2002) (quoting Chase Riveland, *Supermax Prisons: Overview and General Considerations* 3 (1999)).

[2]On December 12, 2005, the ADOC doubled the number of weekly hours that inmates are permitted to spend in their recreation areas. At present, it is undisputed that SMU-2 inmates may spend three two-hour sessions per week in their recreation areas, for a total of six hours.

[3]SMU-2's maximum capacity appears to be 720 inmates.

1    the inmates in adjoining cells, they are allowed no face-to-face communication, nor

2    can they pass notes or share legal documents.

3  6.   Each cell contains a sink, a toilet, a bed, and a writing surface with a stool bolted to

4    the floor.

5  7.   STG-validated SMU-2 inmates may have visitors, but only one visit per week for a

6    maximum of two hours.  During that time, inmates are separated from their visitors

7    by glass, so no touching can occur.  Inmates are allowed one five-minute phone call

8    per week and are ineligible for compassionate escorted leave.  They can also send and

9    receive mail.

10 8.   Inmates may speak to the prison staff several times per day, and they have access to

11    counselors, with whom they may speak face-to-face five times per week.

12 9.   Inmates are ineligible for out-of-cell work, vocational, or educational programs, but

13    may do in-cell programs.  A library containing legal materials is available to inmates,

14    who may check out materials several times per week.

15 10.  STG-validated SMU-2 inmates cannot purchase food from the commissary, but may

16    purchase other goods such as hygiene-related items, vitamins, televisions, walkmen,

17    and clothes.

18 11.  Inmates are allowed three showers per week, which coincide with the three out-of-cell

19    exercise sessions to which they are entitled each week.

20 12.  Before an inmate is removed from his cell for any reason - including transport to the

21    recreation area - an officer performs a full body cavity search that requires the

22    removal of all clothing, applies "restraint gear," then escorts the inmate to the

23    destination by walking behind him.

24 **The Origins of the Current STG Policy**

25 13.  At the time these actions were initiated, an inmate who was validated as an STG

26    member was transferred to SMU-2 indefinitely.  The only way that an inmate could

27    secure his transfer out of SMU-2 (apart from completing his prison term) was to

28

renounce his membership in the prison gang and successfully complete a debriefing process.[4]

14.    The policy of transferring validated STG members to SMU-2 originated in 1997 when Terry L. Stewart was the ADOC Director.

15.    That policy was embodied in ADOC Departmental Order ("D.O.") 806.

16.    In connection with a previous case, Stewart had occasion to give a deposition concerning, among other issues, his motivation in implementing the STG policy. (Pls.' Ex. 103 ("Stewart Depo.").)   His views on that subject are somewhat contradictory.  Initially, Stewart agreed with the statement that "one of the goals of the placement in SMU2 after STG validation was to deter others who might be [in the] system from joining or associating with gang members."  (Stewart Depo. at 9.) Stewart also agreed that the policy was implemented "to demonstrate . . . the severe sanctions that follow from an STG validation."  (Stewart Depo. at 9.)

17.    However, later in the deposition, Stewart appeared to distance himself from his prior statements that the conditions in SMU-2 constitute sanctions.  According to Stewart, a "sanction," which stems from a disciplinary infraction, can lead to a loss of privileges, such as appliances or good time credit.  (Stewart Depo. at 14-15.)  But when a particular inmate becomes enough of a disciplinary problem, his classification can increase and he may be placed in a facility with more restrictive conditions. (Stewart Depo. at 14-16.)  The conditions in the more restrictive facility, in Stewart's view, are not sanctions, even though those conditions may, in some circumstances, closely parallel the conditions that a prisoner may be placed in when he is being

---

[4]With regard to debriefing, D.O. 806 states that "[t]he purpose of debriefing is not to obtain incriminating evidence information or evidence against the member.  The primary objective is to learn enough about the member and the STG to:  [c]onvince the Department that the inmate has withdrawn from the STG[;] Provide additional information regarding the STG's structure, activity and membership that would adversely impact the STG and assist in management of the STG population[;] [and] Provide sufficient information to determine if the inmate may require protection from other STG members or suspects."

1    sanctioned as a result of a disciplinary infraction. (Stewart Depo. at 16.) Thus, "[y]ou
2    can be sanctioned and not have your classification changed, . . . [and] [y]ou can have
3    your classification changed and not be sanctioned." (Stewart Depo. at 17.)

4    18.   This appears to be a somewhat specious distinction. Stewart confined validated STG
5          members to a highly restrictive environment, at least in part, to deter potential STG
6          members from joining an STG. The fact that Stewart does not label those conditions
7          as sanctions is irrelevant.

8    19.   So while it is clear that at least part of the general motivation behind the STG policy
9          was the punitive purpose of deterrence, it is sometimes difficult to see how that
10         motivation manifested itself with respect to particular conditions of confinement.

11   20.   For example, Stewart was asked to explain the reasoning behind allotting validated
12         STG members three hours per week in the recreation area. Stewart responded that,
13         "[t]he impetus for the change generally across the entire special management unit was
14         driven by work load for the available staff. Giving . . . an inmate a shower and
15         recreation more than what is constitutionally required just creates a workload on the
16         staff that was unnecessary and so we looked at what we felt was by case law a
17         constitutional minimum with regard to that and we complied with that. . . . [P]art of
18         the reason I approved that is because I believe it meets constitutional standards."
19         (Stewart Depo. at 10-12.)

20   21.   Elsewhere in the deposition, Stewart described the penological purpose behind other
21         conditions of confinement, and none of the purposes were punitive in nature. For
22         example, the reduced calorie diet is correlated to the limited physical exercise of
23         SMU-2 inmates. (Stewart Depo. at 25.) The reduction in the number of outside visits
24         allowed is attributable to security concerns, as is the prohibition on the purchase of
25         food items from the commissary. (Stewart Depo. at 26.) With regard to the latter, the
26         goal was to reduce the interaction between prison officials and SMU-2 inmates
27         because of the high risk of attack when food is passed through the slot. (Stewart
28         Depo. at 28.) On one occasion, an officer "reached in through the food slot to get a

1    Styrofoam cup and he had his neck slit from side to side." (Stewart Depo. at 28.)

2    This sort of attack was not uncommon. (Stewart Depo. at 28.)

3    22.   Finally, Stewart answered questions about what he perceived to be the impact of the

4    conditions in SMU-2 on the inmates' mental health. On this point, Stewart was

5    unequivocal: "I do not believe that [SMU-2] impacts their mental health." (Stewart

6    Depo. at 22.) According to Stewart, the bases of that opinion are his own "common

7    sense" and discussions with prison medical personnel. (Stewart Depo. at 22-24.)

8    23.   Stewart's tenure as ADOC Director ended in November 2002.

9    24.   At trial, Plaintiffs presented a video documentary entitled "Correction" that was

10   apparently filmed in 2002 but released in 2004. The documentary shows footage of

11   the training of ADOC corrections officers at the ADOC Correctional Officer Training

12   Academy in Tucson, Arizona. In one segment, an instructor explains to trainees the

13   "authoritarian" philosophy that should govern their interactions with "high security"

14   inmates, including those in SMU-2. That philosophy, as explained by the instructor

15   contains three parts: first, "what [the officer] says, goes"; second, inmates have rules

16   and will be punished for violating those rules; and third, "[i]f you make [the] inmate's

17   life miserable enough, [the] inmate will change." The instructor elaborated on these

18   three points by explaining that, "[t]here is no room for negotiation."

19   **STG Policy under Director Dora Schriro**

20   25.   The current Director of the ADOC is Dora Schriro. She has held that position since

21   May 26, 2004, but was Acting Director as of July 1, 2003.

22   26.   The STG policy that she inherited from her predecessor appears to be extremely

23   similar, if not identical, to that which was implemented by Stewart. That is to say, the

24   policy does not appear to have changed significantly during the interim tenure of

25   ADOC Director Charles Ryan.

26   27.   Director Schriro has implemented significant changes to the STG policy which appear

27   to have taken effect on March 15, 2006. The new policy enables validated STG

28   members to secure their release from SMU-2 in a manner other than debriefing,

though debriefing still remains an avenue of release from SMU-2. This "Step-Down" Program, which is explained in a revised D.O. 806, "permits active inmates, who have been validated as STG members, to remove themselves from STG activity and demonstrate to Department staff that they are no longer involved with STG activity. All inmates shall be required to complete 48 months as a validated STG member, where their activity shall be monitored, to successfully complete the Step-Down Program." (D.O. 806.08(1.1).)

28. According to Director Schriro, the Step-Down Program was founded upon the premise that because the vast majority of inmates will eventually be released back into society, a prison should be managed in way that prepares inmates for that eventual return. The Step-Down Program creates a system of incentives to encourage inmates to behave in a more civil, less-violent manner, and to take full responsibility for their actions.

29. Director Schriro acknowledged that this view of prison management represents a significant shift from that of her predecessors. However, at trial, Director Schriro did not profess to be critical of prior STG policy. Rather, she simply subscribed to a different conception of prison management that elevated the importance of incentive-based programs as a way of minimizing violence and preparing inmates to re-enter society.

30. Director Schriro was also asked to describe the rationale behind the pre-Step-Down STG policy. While she obviously could not testify as to Stewart's motivation for implementing that policy, her own perception of the policy was that it was not punitive in nature, and in particular, she did not view it as a deterrent to other inmates from associating with STGs.

31. Director Schriro had no knowledge of the "Correction" documentary, which was created before her tenure as either Acting Director or Director. She testified that she has never espoused the view that a prison should "make life as miserable as possible"

1   for its inmates in order to "change" them.  She would not comment on the video itself

2   because she had not seen it prior to trial, and at trial, she saw only two minutes of it.

3   32.   Director Schriro's views as to the non-punitive nature of the pre-Step-Down STG

4   policy were echoed by all of the other witnesses at trial who held supervisory or

5   directorial positions at either the ADOC in general or SMU-2 in particular.

6   33.   For example, Carson McWilliams, the SMU-2 Deputy Warden, testified that the

7   policy exists to segregate STG members from the general inmate population out of

8   concern for the security of prison staff and other inmates.  Deputy Warden

9   McWilliams has worked for the ADOC for about twenty-eight years in various

10  capacities and in various prisons.  While he was not at SMU-2 at the time the STG

11  policy was in development, he was present at some of the early meetings at which the

12  goals of the STG policy were discussed.  In Deputy Warden McWilliams's opinion,

13  the STG policy was not designed to "punish, chastise or deter" other inmates from

14  associating with STGs.

15  34.   Samuel Sublett, the ADOC's Division Director of Offender Operations and an ADOC

16  employee for about twenty-eight years, agreed.  It is unclear what position he held at

17  the time D.O. 806 was created, but he did opine that its purpose was not to punish, but

18  "to identify and segregate members of the population whose behavior warranted

19  removal.  Their behavior . . . had a tendency to compromise . . . the staff's ability to

20  maintain the good order of our institutions."  Validated STG members posed a

21  particular threat to security in light of their "predatory" tendencies, and affinity for

22  "extortion, drugs, pressure, [and] assaults."

23  35.   In sum, the evidence is undisputed that the current ADOC administration perceived

24  the pre-Step-Down STG policy to be rooted in the need to segregate validated STG

25  members from the remainder of the prison population to ensure the security of prison

26  staff and inmates.  There is no evidence that they intended the pre-Step-Down STG

27  policy as a method of deterring or otherwise punishing validated STG members.

28

36. With that background, the Court turns to the particular conditions at issue in this litigation.

**Food**

37. As mentioned above, the constitutionality of the food in SMU-2 is at issue only in Baptisto's case.  Whereas the other two Plaintiffs had their food claims dismissed on summary judgment, Baptisto's claim was allowed to proceed because he alleged that he suffered a seventy-five pound weight loss upon his transfer to SMU-2.

38. Inmates in SMU-2 are provided a 2,800 calorie diet per day.

39. At several points in the trial, Baptisto made reference to statements in one of Defendants' briefs that the diet consisted of only 2,500 calories per day.  The Court concludes that those statements are inaccurate.  First, statements by an attorney in a brief do not constitute admissible evidence.  Second, even if they did, all of the witnesses at trial with personal knowledge of the SMU-2 diet testified that the correct per day calorie count is 2,800.  Those witnesses include Director Schriro, SMU-2 Deputy Warden McWilliams, Marvel Morrison, a dietician employed by Canteen Correctional Services, and Dr. Sheryl McGrill, a physician employed by the ADOC who works at the ADOC's Eyman Complex in Florence, Arizona, which includes SMU-2.

40. Morrison was Defendants' principal witness concerning the adequacy of the SMU-2 diet.  Her position as dietician, which she has held since April 2004, consists of auditing ADOC diets and meal patterns, helping to formulate diets, and making recommendations concerning the diets.

41. In her view, the SMU-2 diet, which has gone relatively unchanged since 2002, provides an adequate amount of daily nutrition.

42. First, the number of calories in the diet is based on the sedentary lifestyle that SMU-2 inmates lead.  In Morrison's view, a higher calorie diet could negatively impact the health of SMU-2 inmates, by leading to, among other issues, weight gain, heart problems and diabetes.

43.  Inmates in the general population who lead a more active lifestyle are given a diet with an elevated calorie count.  While Morrison was not certain as to the precise number, she believed it is about 3,100 calories.

44.  The substance of the 2,800 calorie per day diet is formulated based on national nutritional recommendations made by the United States Department of Agriculture ("USDOA") and the National Academy of Sciences ("NAS").  In particular, Morrison testified that the diet was influenced by the USDOA's food pyramid and the NAS's Dietary Reference Index ("DRI").[5]

45.  At trial, Baptisto testified that the SMU-2 diet causes him to feel hungry constantly, and that it has left him in a weakened condition.  Baptisto also submitted into evidence his ADOC medical records, which he believes show that his transfer to SMU-2 caused him to lose up to seventy-five pounds.

46.  On cross-examination, Baptisto admitted that he never submitted a Health Needs Request ("HNR") concerning his alleged malnutrition, fatigue, or lethargy.  He attributed this to his fear that ADOC officials were "out to get me."  In spite of this fear, Baptisto submitted multiple HNRs concerning problems with his teeth in 2003.  He also submitted an HNR because he wanted a blood test to determine whether he had diabetes.  Baptisto has never alleged that he has received improper medical care for the HNRs that he has submitted.

47.  Two defense witnesses were called to refute Baptisto's claims.  The first was Morrison, who, in addition to the testimony described above, examined aspects of Baptisto's medical records.

---

[5]Morrison provided the Court with a brief overview of the history of the DRI. Beginning around World War II, the NAS issued Recommended Dietary Allowances ("RDAs") which suggested the proper nutrition levels that a diet should contain.  About five years ago, the NAS began to issue DRIs which Morrison believed represent more accurately the nutritional values that should be contained in one's diet.

1   48.   Baptisto's records indicate that he is five feet and eleven inches tall, and between 1990
2         and 2002 (the year he was transferred to SMU-2), his weight hovered in the range of
3         210 pounds.  By 2004, his weight had decreased to about 170 pounds.

4   49.   Morrison stated that while she could not provide a definitive explanation as to what
5         had caused the drop in weight, she did testify that it was not due to any deficiency in
6         the SMU-2 diet.  First, she stated that the SMU-2 diet is between 100 and 300 calories
7         per day less than the standard inmate diet that Baptisto was consuming in his previous
8         location, and that such a relatively small decrease could not account for the weight
9         loss.  Second, she stated that, according to NAS's DRI, a male between the ages of
10        twenty-one and fifty years old leading a sedentary lifestyle requires 2,400 calories to
11        maintain his weight, and the SMU-2 diet far exceeds that amount.   Third, she
12        acknowledged that she was unaware of what commissary items Baptisto was eating
13        in his former housing unit, but that commissary items typically were "empty calories"
14        such as chips and soda, and the elimination of commissary privileges could have
15        played a role in the weight loss, though she noted that the elimination of the empty
16        calories would have been beneficial to Baptisto's health, not detrimental as he
17        suggested.  Finally, Morrison stated that Hepatitis C could conceivably cause a drop
18        in weight, but Baptisto stated that he does not have Hepatitis C, and there is no
19        evidence to contradict Baptisto's statement.

20  50.   The second defense witness who testified concerning Baptisto's diet was Dr. McGrill,
21        an ADOC physician since March 2005 who has been practicing medicine for almost
22        twenty years.  Her focus at ADOC is exclusively on patient care.

23  51.   Dr. McGrill opined that an approximately forty pound drop in weight over a three-
24        year period was not a particularly rapid weight loss nor did it necessarily suggest
25        malnutrition.  Dr. McGrill computed Baptisto's Body Mass Index ("BMI") when he
26        weighed 208 pounds to be 29.[6]  In her view, that figure suggests that Baptisto was

27  _____

28        [6]Dr. McGrill may have miscalculated Baptisto's BMI.  Defense counsel informed Dr.

1    clearly overweight and bordering on obese.  His more recent weight of nearly 160

2    pounds was within the proper weight range for his height.

3   52.   Dr. McGrill also noted that Baptisto was given a blood test in August 2004 at his

4    request, and the results revealed no evidence of malnutrition.  In her view, if Baptisto

5    was suffering from malnutrition, it would have manifested itself in his "blood

6    proteins" and "blood count."

7   53.   Also, it was pointed out to Dr. McGrill that Baptisto actually gained six pounds in one

8    year while in SMU-2.  Whereas Baptisto weighed about 168 pounds in October 2004,

9    he weighed 174 pounds in September 2005.  Dr. McGrill noted that, "if you're gaining

10   weight, you're consuming more calories than you need."

11  54.   Having considered all of the evidence, the Court does not believe that the SMU-II diet

12   has caused Baptisto to become malnourished.  That conclusion is based on the

13   following:

14  55.   The Court finds the testimony of Morrison and Dr. McGrill to be highly persuasive.

15   In particular, the Court believes that based on their testimony, the SMU-2 diet

16   contains a sufficient number of calories for a person of Baptisto's gender, age, size,

17   and sedentary lifestyle.  The diet also contains federally-recommended nutrition

18   levels.

19  56.   Baptisto never submitted any HNRs relating to his alleged malnutrition, and the Court

20   finds his stated reason for failing to do so - fear that prison officials were "out to get

21   him" - to be implausible in light of his submission of multiple HNRs for other health

22   issues, all of which ADOC appears to have responded to in a satisfactory manner.

23

24

25   McGrill that Plaintiff's height is "six foot one, which is 71 inches."  In fact, seventy-one

26   inches is not equivalent to six feet and one inch, but five feet and eleven inches.  It is not

27   clear whether Dr. McGrill relied on the seventy-one inch figure or the six feet and one inch
     figure to calculate Baptisto's BMI.  In any event, even if she relied on the erroneous number,

28   it would have benefitted Baptisto.

57.   There is no evidence that Baptisto was malnourished.  His blood tests revealed no evidence of malnutrition.  His current weight is within the normal range for his height, and his weight prior to his transfer to SMU-2 was well-beyond the normal range, and actually increased his risk of physical illness.

58.   Baptisto did not lose seventy five pounds upon transfer to SMU-2.  Rather, he lost forty pounds over three years, a reasonable rate of weight loss.  Also, there are periods during Baptisto's incarceration in SMU-2 that he has actually gained weight, further undercutting his opinion that he is in a state of starvation.

59.   While the Court does not come to a conclusion as to the cause of the weight loss, one likely cause is the elimination of the ability to purchase food from the commissary in SMU-2.  Commissary food appears to generally fall under the label of "junk food," and its elimination from Baptisto's diet, if anything, is likely to improve his health, especially, as Dr. McGrill notes, in light of his fear of developing diabetes.

60.   The Court also concludes that the intent of the ADOC in implementing the current SMU-2 diet is non-punitive in nature.  While former Director Stewart may have generally intended that the indefinite segregation of validated STG members in SMU-2 serve as a deterrent to other inmates contemplating involvement with STGs, that purpose has not manifested itself in the diet given to SMU-2 inmates, and Stewart himself testified in his deposition that the lower-calorie SMU-2 diet exists because of the reduced level of activity of SMU-2 inmates.  Also, the testimony by the current members of the ADOC administration uniformly rejected any suggestion that any of the conditions in SMU-2 exist for the purpose of punishing validated STG members or deterring potential STG members.

61.   Rather, the diet has been formulated with the exclusive intention of meeting the inmates' nutritional and caloric needs in light of their reduced-activity lifestyle.

62.   The footage from the "Corrections" documentary does not affect the Court's conclusion about the ADOC's intention behind the SMU-2 diet.  There is simply no indication that the instruction to the trainees in the video to make life "as miserable

as possible" for SMU-2 inmates relates to the food SMU-2 inmates are served.  In fact, the Court does not believe that the documentary has any impact on the instant litigation.  There has never been any allegation of officer misconduct or any abuse of SMU-2 inmates apart from the general conditions of confinement.  The documentary, and all of the other evidence admitted at the bench trial, fail to establish any sort of nexus between the training of ADOC correctional officers and the conditions of confinement presently at issue.

63.   As a final note, at the time these actions were commenced, STG-validated inmates were not entitled to purchase food from the commissary.  As the Court held in its Orders granting in part Defendants' motion for summary judgment, inmates do not have a constitutional right to purchase food from the commissary.  The Eighth Amendment, as will be discussed more fully below, simply guarantees inmates the right to adequate food.  As long as prisoners receive an adequate diet from the prison, they have no right to purchase food items from the commissary.

**Lighting - Overview**

64.   All three Plaintiffs contend that the lighting conditions in SMU-2 constitute cruel and unusual punishment in violation of their Eighth Amendment rights.

65.   At trial, the Court heard and saw extensive evidence concerning the lighting conditions in SMU-2.  That evidence consisted of videotapes of the prison, the testimony of witnesses and documentary evidence.  The videotapes, which were admitted into evidence as Exhibits 99 and 100, depict the recreation area as well as the inside of a typical SMU-2 pod and cell, both with the day lights on and off, with only the security light illuminating the cell.

66.   Each building within SMU-2 contains twelve clusters; each cluster contains six pods; and each pod contains ten cells, five on the lower level, five on the upper level.

67.   Part of the ceiling in each cluster consists of skylights.

68.  Each cell in SMU-2 has the same physical layout and appearance.  The wall to which the light is attached is dark grey, and the remaining walls appear to be an off-white color.

69.  Diaz testified that the walls in his particular cell are "bright white," with the exception of the wall to which the sink is connected, which Diaz said was gray.

70.  The front of the cell does not contain bars like in a traditional cell, but consists of a solid sheet of metal with perforations measuring less than one inch in diameter.  Both the door and the remainder of the front of the cell are perforated, and the door contains a solid trap which is used for various purposes including passing food and other items into the cell, as well as securing inmates before they are removed from the cell.

71.  When one enters the cell, there is a bed against the far wall.  Against the left wall is a sink, a toilet and a surface for writing.  Bolted above the sink is a mirror that appears to be made of metal.

72.  Several inches above the mirror is the cell's sole lighting fixture, which is a rectangular box approximately two feet across by ten inches down.  That fixture is covered in a high-impact resistant plastic.

73.  Within that lighting fixture are four lights, one of which is a "security" light that remains illuminated for 24 hours per day.  The security light consists of a seven watt fluorescent bulb; the other three lights are each forty watts.  The three non-security lights are directional; that is, one bulb points up and two point down.

74.  The non-security lights are turned off between 10 p.m. and 4 a.m. on weekdays, and 12 p.m. and 4 a.m. on weekends.

75.  During the hours that the non-security lights are off, there is minimal light entering each cell from outside.  At the end of the five-cell hallway, there is a fluorescent light fixture that remains on at all times.  There is also some light from the security tower that can be seen through the skylight.

76. Gerald Katafiasz, an electrical engineer with experience conducting lighting surveys and in particular light-level evaluation, was hired by the ADOC to measure the lighting in the SMU-2 cells.

77. To measure the lighting, he used a light meter, which he calibrated before taking light measurements.

78. The unit of measurement that the light meter employs is the "foot candle." Katafiasz defined a "foot candle" as the amount of light that a candle puts off in an approximately one square foot area around the candle.

79. Katafiasz made two visits to SMU-2, the first on December 2, 2005, the second on December 15, 2005. Both visits were to SMU-2's King Cluster, Pod 6. His first visit was during the daytime. He arrived at approximately 2:15 p.m. and left one hour later. His second visit was at night. He arrived at 9:45 p.m. and left at 10:45 p.m.

80. On both occasions, he took light readings from within various cells and from outside the cells but within the pod.

81. First, he took light readings from the lower level of the pod directly beneath the skylights. During the day, the light measurement was eighty-eight foot candles. At night, he took two readings from that location. On the first reading, the day-use lights were on, and the light measured eight foot candles. On the second reading, the day-use lights were off but the fluorescent light at the end of the hall was on, and the light measurement was .6 foot candles.

82. During the day, Katafiasz took two additional readings from outside the cells but within the pod. On the second level in front of a cell door, the light reading measured fourteen foot candles. On the second level near the hand rail (farther away from the cell door), the light reading measured sixty-two foot candles.

83. On both occasions, Katafiasz took light readings from within four cells, two on the lower tier and two on the upper. During the daytime, the average amount of light at the writing surface was thirty-five foot candles; the average at the sink was seventy-two foot candles; and the average at the cell bed was two foot candles. At night,

Katafiasz took light readings from within the same four cells, but with the cell door open, and only the security light on.  The average light readings were 1 foot candle by the sink area, .85 foot candles by the writing area, and .25 foot candles by the bed.

84. The sink area is brighter because the lighting fixture is centered directly over it.

85. The light reading for the bed area varies depending on the distance from the light fixture.  One end of the bed touches the wall to which the light fixture is attached; the other end of the bed touches the opposite wall and is consequently darker at night.  The average light reading for the end of the bed that is farther from the light is .21 foot candles.

86. The light readings for all four of the cells were very similar.  For example, the light measurements taken at night for the portion of the bed father from the light fixture were, respectively, .22, .20, .21, and .21.  The measurements for the portion of the bed closer to the light fixture were, respectively, .33, .27, .29, and .29.

87. It is unclear to the Court why the light measurements taken at night were not taken with the cell doors closed, as inmates obviously sleep with their cell doors closed.

88. Katafiasz conceded that he did not analyze the lighting conditions in the actual cells where Plaintiffs are housed.

89. Katafiasz also testified that the socket that the seven watt security bulb occupies could not tolerate a higher watt bulb.

90. Deputy Warden McWilliams equated the brightness of the security light to that of a child's nightlight.

91. The Court concludes that the light readings taken by Katafiasz on his two visits to SMU-2 closely approximate the light levels in Plaintiffs' respective cells.  That conclusion is based on the following:

92. Multiple ADOC officials, including Deputy Warden McWilliams and Sublett, testified that all cells within SMU-2 are essentially the same.  In particular, the cells have the same physical layout, in terms of the location of the bed, the sink and the light fixture, and the cells all contain the same security light.

93.   Katafiasz testified that the sockets that the security lights screw into could not accommodate a bulb higher than seven watts.

94.   Plaintiffs did not specifically dispute that the light fixtures in their cells were of a different appearance than those depicted in Exhibits 99 and 100.  In particular, they did not testify that the plastic casing around the four bulbs was, for example, lighter or darker on their cells than those depicted in the videos.

95.   While Plaintiffs argued that their cells are generally brighter than those examined by Katafiasz, there is no credible evidence to support that contention.  One difference that Diaz pointed out was that while one of the cells in Exhibit 100 appears to have a sort of plexiglass over the cell door, his cell does not.  While that may be true, it is irrelevant to the issue of whether his cell is brighter than those examined by Katafiasz.

**Lighting - Penological Purposes for Security Light**

96.   Several ADOC employees testified concerning the penological purposes for the security light and other aspects of the lighting in SMU-2.

97.   The penological purposes for the security light relate to the health and welfare checks that officers perform every hour.  Deputy Warden McWilliams estimated that each security check requires approximately three minutes per pod.  That is, it takes three minutes for the officer to check all ten cells within a pod.

98.   The purpose of the hourly checks is to ensure that inmates are present in their cells and are alive.

99.   SMU-2 inmates are not permitted to cover their entire faces, as it would make it impossible to tell whether they are alive.  They are, however, permitted to cover their eyes.  The key, according to ADOC Correctional Officer II ("C.O. II") Randy Hubbard, is whether the officer can "see flesh" and see that the inmate is breathing.

100.  Two officers are required to perform the hourly checks.  The first officer is the one actually walking through the pod and performing the checks.  The second officer remains in the center of the cluster area on the second level and provides "visual backup."

101.  According to Sublett, the security light is essential to the safety and security of corrections officers who are required to perform the hourly checks: "Because of the nature of the behavior of the individuals that live in SMU-2, it's important that when . . . an officer approaches the cell front he has some sense of depth perception so he knows where the inmate is at in the cell.  The perforated cell fronts are not the most ideal form of visibility for our corrections officers.  I am not interested in having an officer walk up to a dark cell for risk of their safety."

102.  The origins of the security light in SMU-2 can be traced back to SMU-1, which is "the first generation of maximum security prisons in Arizona."  Before SMU-2 was constructed, comments and feedback were solicited from officers working in SMU-1 concerning ways to improve the safety and security of the new prison.  One area where officers felt improvements could be made was the lighting.

103.  SMU-1 cells do not contain a 24-hour security light.  Corrections officers must do hourly checks using flashlights.  The perforated cell fronts make it difficult for officers to see into the cell.

104.  While officers in SMU-1 still use flashlights to do the hourly checks, and while those checks are, in Sublett's view, "generally successful," SMU-2 inmates pose greater security risks to the safety of the officers such that flashlights would be an insufficient way to examine a cell at night.

105.  Deputy Warden McWilliams agreed with Sublett's conclusions concerning the security light as an important tool for officer safety.

106.  The deputy warden also testified that in his experience, the use of flashlights in lieu of security lights is highly disruptive to the inmates' ability to sleep.  Whereas a security light provides a low, constant level of light, an officer performing a health and safety check with a flashlight is required to shine it in the faces of sleeping inmates to determine whether they are present and alive.

107.  Deputy Warden McWilliams also testified that if flashlights were used in place of security lights, there would be blind spots in the cells as the officer performing the

1

2

3

checks approached.  These blind spots would be particularly problematic in light of the history of assaults by SMU-2 inmates against officers, sometimes through the use of metal darts shot through the perforated holes that make up the front of the cell.

4

5

6

7

8

9

10

11

108.   On cross-examination of Deputy Warden McWilliams, Diaz asked whether it would be possible for the security light to be turned on only when the corrections officers are performing the hourly checks and turned off the remainder of the time.  Deputy Warden McWilliams answered in the affirmative,[7] but speculated that the act of turning the lights on and off might disrupt sleeping inmates.  Second, he theorized that turning the lights on and off "might have an impact on the light switch itself."  Third, he seemed to suggest that it would require additional manpower, though it is not clear why that would be the case as both scenarios require two officers.

12

**Lighting - Penological Purpose for Sleep Schedule**

13

14

109.   As mentioned above, the three non-security lights in SMU-2 cells are turned off between 10 p.m. and 4 a.m. on weekdays and between 12 p.m. and 4 a.m.

15

16

17

110.   Once the non-security lights are turned off, inmates are still permitted to use appliances like walkmen, though televisions, which operate on a closed circuit that is controlled by the ADOC, are shut off.

18

19

111.   According to Deputy Warden McWilliams, inmates are permitted to continue sleeping after all of the lights are turned on, but they must be awake by 7 a.m.

20

21

22

112.   Deputy Warden McWilliams was unaware of why the lights are dimmed for only four hours on weekends, but he speculated it was because inmates wanted to stay up for various reasons, like writing letters or reading.

23

24

25

26

27

28

[7]C.O. II Hubbard testified that it was not possible for the security lights to be turned on and off during the hourly checks.  For reasons that will be discussed below, the resolution of this factual dispute is immaterial to the Court's decision with respect to the lighting claim.

113.   Defendants' Exhibit 77 is a log of a typical day in SMU-2.  The log illustrates the highly regimented existence led by SMU-2 inmates and officers.[8]

114.   For example, breakfast begins at 4:30 a.m., and from 5:30 a.m. to 5:50 a.m., officers conduct a "formal count."  At 6:00 a.m., there is a "sharps count" conducted, and from 6:25 a.m. to 6:35 a.m., there is a security and sanitation inspection.  At 8:00 a.m., feeding is completed and trays are picked up.  Also at 8:00 a.m., education and visitation turns are completed.  At 8:30 a.m., inmates begin recreation and shower time.  This detailed schedule continues throughout the day until midnight, when there is another security check and officers pick up mail and library books.

**Lighting - Effect on Mullins**

115.   Plaintiff Mullins briefly testified at trial.  He offered no testimony or other evidence concerning the effects, if any, of the allegedly inadequate lighting.

116.   He stated that, in general, the conditions in SMU-2 were "deliberately inflicted on us . . . and long term exposure to these conditions can cause damage, not necessarily will, but can cause damage."

117.   Mullins never submitted an HNR relating to the health effects, if any, he was suffering as a result of the lighting.  In particular, he never complained to the ADOC of an inability to sleep or of any adverse psychological or physical effects of the lighting.[9]  Nor did he testify to that effect.

**Lighting - Effect on Baptisto**

118.   Plaintiff Baptisto also testified at trial.  He stated that the 24-hour lighting has adversely effected his sight and caused him to see hallucinations, which take the form of "bugs."  The hallucinations began when he was transferred to SMU-2 in June 2002,

---

[8]Deputy Warden McWilliams testified that this log was created before the switch from three hours of recreation time per week to six hours.  However, that switch did not affect the log by more than "a few minutes."

[9]Deputy Warden McWilliams testified that he has never been made aware of an HNR filed by an SMU-2 inmate complaining of an inability to sleep.

1    and he frequently found himself "going around in circles," trying to swat the bugs, but

2    "they just keep coming. . . .  And after several days, I stopped and I started thinking,

3    Why am I chasing bugs that don't exist? And ever since then, every now and then, I'll

4    sit there and I'll . . . be looking at the light and they'll start coming and I have to tell

5    myself that they're not real."  Baptisto testified that the hallucinations occur less

6    frequently now because he has learned to distract himself by watching TV and doing

7    other activities, but sometimes the bugs "still come fly in my face."  He also stated

8    that if he looks directly into the light, his eyes "start to burn."

9    119.   According to Baptisto, the lights also affect his ability to sleep, and he sometimes

10         sleeps as little as two to three hours per night.  He sometimes attempts to sleep by

11         covering his face with a blanket, but officers performing their hourly health and

12         welfare checks do not allow that, and bang on his cell door to wake him up.

13   120.   On cross-examination, Baptisto conceded that he has never made a medical request

14         concerning the hallucinations or the alleged effect of the lighting on his vision, his

15         ability to sleep or his energy level.  Nor has Baptisto submitted a medical request for

16         any issue relating to his mental health.  According to Baptisto, the submission of an

17         HNR would be futile because "they're out to get me. . . . [I] have to always be

18         watching out for them."

19   121.   However, as mentioned above, Baptisto submitted multiple HNRs for other health

20         issues, like problems with his teeth and his fear that he had developed diabetes.  He

21         does not contest that those concerns were adequately addressed by ADOC medical

22         personnel.

23   122.   For these reasons, the Court has considerable doubt about Baptisto's credibility with

24         regard to the effects he claims to suffer from the lighting.

25   **Lighting - Effect on Diaz**

26   123.   Plaintiff Diaz testified at trial about the effect that the 24-hour lighting has had on his

27         mental condition and his ability to sleep.  According to Diaz, the lighting renders him

28         unable to fall asleep and he has developed "health problems such as migraine

- 23 -

1   headaches."  He also believes that the lighting has led to the deterioration of his
2   vision, causing him to wear eyeglasses, which he claimed he never wore before his
3   transfer to SMU-2.

4   124.   On cross-examination, however, Diaz did not dispute that he had glasses before his
5          transfer to SMU-2 and that, "to some degree," he had poor eyesight.  On May 16,
6          2001 (one day after his transfer to SMU-2), he submitted an HNR stating, "I need
7          glasses. I've had a pair before but they broke and were contrabanded. . . . I think my
8          eyes have gotten worse." Later in cross-examination, Diaz stated that his eyesight had
9          begun to deteriorate when he was housed in SMU-1, which, according to Diaz, has
10         the same lighting conditions as SMU-2.  There is no evidence that Diaz submitted an
11         HNR concerning his eyesight while he was housed in SMU-1.

12  125.   Diaz also did not dispute on cross-examination that his first HNR concerning his
13         migraines occurred on February 24, 2004, about six months after he filed the instant
14         lawsuit.

15  126.   However, the HNR does allude to the fact that prior to the submission of the HNR,
16         Diaz had been taking Ibuprofen for his headaches.  The evidence was undisputed that
17         an inmate need not submit an HNR to obtain over-the-counter medications such as
18         aspirin and Ibuprofen.  It is not clear how far in advance of the February 24, 2004
19         HNR Diaz began to take the Ibuprofen, though Diaz did see a doctor on March 2,
20         2004 and informed the doctor that he had been suffering from severe headaches in the
21         back of his head and neck for the last three months, and that Ibuprofen was no longer
22         effective.  Diaz saw the same a doctor again on April 16, 2004 and complained of a
23         different type of headache, whose symptoms were consistent with those of a migraine
24         headache.  Diaz stated that the headaches lasted for sixty to ninety minutes and
25         sometimes caused blurriness of vision.  At that meeting, Diaz told the doctor that he
26         had "always" suffered from headaches in the back of his head that were helped by
27         Ibuprofen.  For the migraines, Diaz was prescribed Cafergot, a medication that

28

1  combines caffeine and ergotamine.  As of the time of trial, Diaz continues to take that
2  medication.

3  127.  Finally, Diaz was asked to summarize the evidence that he believed demonstrated that
4  the conditions in SMU-2 affected his mental health.  That evidence, according to
5  Diaz, consists of the prescription by an ADOC psychiatrist[10] of Paxil and Prozac,
6  which Diaz took from May 2004 to December 2004 but then voluntarily discontinued
7  because he received articles from his family that he believed demonstrated that those
8  drugs "caused some form of side effects . . . like suicide, suicidal tendencies."

9  128.  The testimony of three other witnesses bears on the alleged adverse effects Diaz
10  claims he has suffered as a result of the lighting in SMU-2.  The first witness is Dr.
11  McGrill, an ADOC physician, the second is Dr. Wanda Taylor, an ADOC psychiatrist
12  who briefly treated Diaz; the third is C.O. II Hubbard, who monitored Diaz's sleep
13  patterns for several months.

14  129.  Dr. McGrill, whose practice at ADOC focuses exclusively on patient care, has an
15  extensive background in diagnosing and treating people with migraine and tension
16  headaches.  The term "headache," Dr. McGrill explained, is an umbrella term that,
17  quite logically, refers to any aching in the head.  "Some headaches have structural
18  causes, such as a brain tumor, skull fracture, [or] sinusitis. . . .  Most headaches are
19  non-structural and of those, there's really no test that we can do to make the diagnosis
20  of . . . headache."  In other words, a physician is entirely reliant on the patient's
21  subjective complaints when formulating a diagnosis.

22  130.  Tension headaches are caused by the tightening of the muscles around the head.
23  Vascular headaches, the most common of which is the migraine headache, are not as
24  well understood.  Dr. McGrill explained that such headaches likely occur when blood
25  vessels leading to the brain constrict and then dilate.  The constriction of the blood
26  vessels often can produce neurological symptoms, such as "flashing light, blind spots,

27

28  [10]Further details of Diaz's meetings with a psychiatrist will be discussed below.

numbness, [and] funny taste."  The pain begins when the vessels dilate.  While migraine headaches sometimes occur on only one side of the head, tension headaches typically affect both sides.

131. Migraines usually begin when a person is between fifteen and twenty-five years of age.  Diaz was twenty-four years old when he submitted his HNR in connection with his headaches.

132. According to Dr. McGrill, there are an essentially unlimited number of triggers for migraine headaches, including stress, heat, and certain types of foods.  Dr. McGrill could not rule out the possibility that constant exposure to bright lights could trigger migraine headaches, as well as deprivation of outdoor exercise, provided that the individual perceived those conditions to be stressful.

133. Both migraine headaches and tension headaches can sometimes be relieved by resting in a dark room.

134. In Dr. McGrill's estimation, 80-90% of the adult population suffers from some form of recurrent headache.  30-50% of those people describe their symptoms as "severe or disabling."

135. On a typical day as an ADOC physician, Dr. McGrill meets with ten to fifteen patients, and of those, one or two patients complain of some form of headache.  Those patients are housed in SMU-2 as well as other ADOC facilities.

136. Dr. McGrill studied Diaz's medical records, and concluded that even assuming the truthfulness of his complaints regarding his headaches, he has suffered no permanent damage to his physical health.

137. The next witness who testified concerning Diaz's mental health was Dr. Wanda Taylor, a psychiatrist who has been employed by the ADOC for five years, and has worked with SMU-2 inmates for about three-and-a-half years, though she does not work exclusively with inmates at that facility.  In all, she has been a doctor for about twenty-five years.

138.   During that time, she estimates that she has diagnosed and treated "thousands" of patients with anxiety disorders.  During her five years with the ADOC, about 10% of the inmates she meets with complain of anxiety.  That number includes SMU-2 and non-SMU-2 inmates.

139.   One of Dr. Taylor's duties is the performance of psychiatric evaluations of ADOC inmates who have been referred to her by one of several sources, including an ADOC mental health therapist.  She also has the responsibility, once diagnosis has occurred, of making recommendations for treatment, which may include prescribing medication.

140.   In May 2004, several months after the filing of this lawsuit, Diaz was referred to Dr. Taylor by a mental health therapist, whom Diaz presumably consulted after submitting an HNR concerning anxiety that he was experiencing.

141.   Dr. Taylor conducted a "telepsychiatry"[11] session with Diaz, and arrived at a preliminary diagnosis of anxiety disorder.  At trial, she described the diagnosis as anxiety disorder "N.O.S.," meaning "not otherwise specified" because "it did not fit a particular anxiety disorder."  At that time, she did not believe the disorder to be "severe."

142.   Dr. Taylor testified that there can be multiple causes for anxiety disorder, and she was unaware, as of her first meeting with Diaz, what caused what she then believed to be his disorder.

143.   After her initial consultation with Diaz, Dr. Taylor prescribed 10 milligrams of Prozac for two weeks, then upped the dosage to 20 milligrams.  Dr. Taylor commonly prescribes Prozac to treat anxiety and depression.

144.   The normal dose of that drug used to treat anxiety and depression is between 20 and 60 milligrams.

---

[11]A "telepsychiatry" session is one in which the psychiatrist and the patient are not in the same room, but in separate locations each equipped with a video camera and a television.

145. Dr. Taylor had a followup meeting with Diaz in July 2004, where he continued to complain of anxiety. Dr. Taylor decided to switch Diaz from 20 milligrams of Prozac to 20 milligrams of Paxil. At that time, Dr. Taylor also recommended some relaxation treatments that Diaz could obtain through the mental health program to help ease his anxiety. Dr. Taylor had no information on whether Diaz pursued the relaxation treatments, and there was no evidence presented at trial that he did.

146. Three months later, Dr. Taylor met with Diaz for a third time, and he stated that he was "doing alright" and he felt "better." Diaz did not disclose any adverse side effects from the drug. Dr. Taylor continued to prescribe the same dosage of Paxil.

147. At their fourth meeting, in January 2005, Diaz informed Dr. Taylor that he had stopped taking Paxil six weeks earlier. He gave what Dr. Taylor described as a "confusing" explanation for the cessation: he said that he was experiencing depression and believed that it was a side effect of the Paxil. Dr. Taylor explained to him that depression was not a side effect of Paxil, and that if anything, if he was experiencing depression, the dosage of the medication should be increased, as Diaz was at the lower end of the normal dosage range.

148. Dr. Taylor also stated that at that meeting, Diaz's "affect was different, meaning . . . that when you look at someone, how someone [is] looking. Are they looking happy? Are they looking sad or are they looking like they have absolutely no emotion? . . . He was smiling. He was grinning. There was something going on. There was a little more going on. . . . [He] didn't appear depressed, didn't appear anxious. And it made me question the diagnosis to begin with. Whether there was something else going on." She also testified that, "There seemed to be some other motive apparent that wasn't being stated. . . . [U]sually when I see someone who's anxious, it's a very uncomfortable feeling. I mean, people don't like feeling anxious. And . . . if they get that kind of relief from [Paxil or Prozac] like Mr. Diaz said he did when he took it, it's unusual for one to stop it or not even want to investigate even another option if you got relief because it is an uncomfortable disorder."

149.  Another reason Dr. Taylor doubted that Diaz ever suffered from anxiety was the time at which he claims the symptoms arose.  Commonly, the occurrence of a particular event triggers feelings of anxiety, such as the illness of a family member or a divorce.  In Diaz's case, he reported no such triggering event to her.  Rather, he informed her that the feelings started to arise, after three years in SMU-2, with no apparent triggering mechanism other than his continued incarceration.  The development of an anxiety disorder under those circumstances is, in Dr. Taylor's words, "unusual."

150.  Dr. Taylor formally terminated the Paxil prescription, and held a final meeting with Diaz in April 2005 to ensure that he was suffering no ill-effects from discontinuing use of the drug.  At that meeting, Diaz told Dr. Taylor that he did not want to try taking Paxil again, "or any other medication."  He also informed her that he did not want to pursue any additional remedies through the prison's various mental health programs.

151.  As mentioned above, at trial, Diaz told the Court that he ceased taking the medication because of articles he says he received from his family about the potentially harmful effects of the drugs, such as suicidal tendencies.  Dr. Taylor disagreed that the drugs she prescribed were dangerous or could cause any mental health damage.

152.  At trial, Dr. Taylor explained that anxiety is the most common mental health complaint that she sees among ADOC inmates, not just within SMU-2 but within all of the ADOC facilities where she treats patients.  She stated that incidents of anxiety are not disproportionately high among SMU-2 inmates.

153.  According to Dr. Taylor, between 8 and 10% of the SMU-2 population suffer from some sort of anxiety disorder.

154.  However, 8 to 10% of people in society as a whole suffer from some sort of anxiety disorder.

155.  Diaz asked Dr. Taylor if she could generally attribute the anxiety or depression suffered by the SMU-2 inmates "to a long term isolation."  Dr. Taylor said that she could not because she sees the same sorts of disorders with the same frequency in

ADOC facilities where there is greater movement and activity allowed. Diaz then asked whether Dr. Taylor could attribute any of the cases of depression or anxiety in SMU-2 to the long term isolation, and Dr. Taylor again responded in the negative.

156.   Dr. Taylor also testified that she did not believe there was any correlation between anxiety and constant lighting. To the contrary, Dr. Taylor recommends nightlights to some of her patients.

157.   Dr. Taylor agreed with Dr. McGrill's testimony that it is possible that constant lighting can cause anxiety if the lighting is a source of stress to the individual.

158.   In sum, Dr. Taylor stated that while her initial diagnosis of Diaz was anxiety disorder, her subsequent meetings with him convinced her that he did not suffer from any mental health disorder.

159.   The final witness who testified concerning Diaz's mental health was C.O. II Hubbard. An ADOC employee for nine years, he has worked at SMU-2 for all but nine weeks of that time.

160.   At the time of trial, Hubbard worked on the graveyard shift, which runs from 8:40 p.m. until 6:40 a.m. One of his duties on that shift is to perform the hourly cell checks.

161.   From July 7, 2005 through February 3, 2006, Hubbard maintained an observational log that described whether or not Diaz was sleeping at various points throughout the night.

162.   The log, which was entered into evidence as Exhibit 102, is summarized in the following chart:

| Month/Year | Number of observations by Hubbard | Number of times Diaz appeared to be asleep |
|---|---|---|
| July 2005 | 12 | 10 |
| Aug. 2005 | 22 | 19 |
| Sept. 2005 | 12 | 11 |
| Oct. 2005 | 9 | 8 |
| Nov. 2005 | 23 | 21 |
| Dec. 2005 | 13 | 11 |
| Jan. 2005 | 7 | 7 |
| Feb. 2005 | 4 | 4 |
| Totals | 102 | 91 |

163. To summarize, Diaz was asleep 89% of the time that he was observed by Hubbard.

164. On ten occasions, Hubbard observed that Diaz was sleeping even with the day-use lights fully activated.

165. More specifically, the day-use lights are activated at 4 a.m.  On every occasion that Hubbard observed Diaz after the day-use lights were activated, Diaz was asleep.

166. Also, of all of the occasions where Hubbard observed that Diaz was awake, only one of those occasions was after 12:15 a.m.  In other words, Diaz was asleep after 12:15 a.m. 99% of the time.

167. Hubbard also testified that Diaz normally sleeps with something over his eyes.

168. Diaz never communicated to Hubbard that he had trouble sleeping.

**Lighting - Conclusions**

169. The Court concludes that the purpose of the security light in SMU-2 is not punitive in nature, but is for the legitimate penological purpose of ensuring the safety of corrections officers during their performance of the hourly cell checks.  That conclusion is based on the following:

170. All ADOC witnesses who testified on this issue agreed that the lights exist to protect the safety of officers during the performance of the hourly cell checks.

171.  To approach a pitch black cell, even with a flashlight, poses a far greater danger to an officer than having the cell already illuminated by the security light.  Even with a flashlight, the cell would retain blind spots, and the perforations on the front of the cell are not amenable to the illumination of the cell with a flashlight.

172.  Also, based on Deputy Warden McWilliams's testimony, the use of flashlights would likely be more disruptive to an inmate's ability to sleep than a security light.  Whereas a security light is constant, the act of pointing a flashlight in the face of a sleeping person would seem to hold greater potential for sleep disruption.

173.  The history of the lighting conditions in the Special Management Units reinforces the non-punitive intent.  As Sublett testified, SMU-2 was constructed after feedback from officers who worked in SMU-1.  They noted some of the problems that could occur if officers were forced to perform checks on cells occupied by exceptionally violent inmates such as those in SMU-2.  The solution was to eliminate the use of flashlights in SMU-2 in favor of seven watt security lights that remain on at all times.  This adaptive process highlights the fact that the security lights exist for the sole purpose of protecting officers from the risk of attack by SMU-2 inmates.

174.  The fact that the day-use lights are turned off for only six hours per night on weekdays and four hours per night on weekends does not detract from the Court's conclusion as to the non-punitive intent behind the lighting conditions.  First, inmates are not required to be awake while the day-use lights are on, and they are permitted to cover their eyes in order to sleep.  In fact, Diaz himself was observed sleeping on multiple occasions after the day-use lights were activated.  Second, Defendants introduced into evidence a daily log of events that occur in SMU-2.  At virtually every moment of the day that the day-use lights are activated, officers or other prison employees are involved in some form of activity, whether it is feeding the inmates, removing food trays from the cells, transporting inmates to visitations, showers, the recreation area, or medical appointments, removing dirty laundry, supplying fresh laundry, picking up HNRs, picking up or dropping off legal materials or mail,

administering insulin to diabetics, conducting security checks and counts, or cleaning the cells, hallways and other parts of the pod.  If the intent were to deprive inmates of the ability to sleep by shutting off the day-use lights for an unnecessarily short period of time, one would not expect to see a schedule so brimming with activity while the day-use lights are on.

175.   Further, if the intent behind the 24-hour security light were punitive, it is unlikely that it would be so dim.  As Katafiasz testified, the light reaching the end of the bed farthest from the wall to which the light is attached measures only about .21 foot candles.  That measurement may have even been lower had it been taken with the cell door closed.  Based on this measurement, Deputy Warden McWilliams's comparison of the seven watt security light to a child's nightlight seems fitting.

176.   The fact that inmates are permitted to shield their eyes from the light further undercuts any suggestion that the lights are punitive in nature.  One can assume that if the intent were to deprive inmates of the ability to sleep, one would not allow them to cover their eyes.  In SMU-2, while inmates are not permitted to cover their entire face, they may cover their eyes as long as the patrolling officer can "see flesh" and determine if they are breathing.

177.   None of the Plaintiffs have ever submitted an HNR about the effect that the lighting has on their ability to sleep or, with the exception of Diaz, any HNR concerning their mental health.

178.   While all three Plaintiffs testified at trial that the lights are problematic, the Court does not credit their testimony.  None of the Plaintiffs offered plausible explanations as to why they did not submit HNRs if they really believed that the lights caused negative health effects.  Baptisto's argument that he refrained from submitting HNRs because of his belief that prison officials are "out to get him" is undercut by the fact that he submitted multiple HNRs about other unrelated issues, all of which ADOC responded to adequately.

179.  With regard to Diaz, while he submitted HNRs concerning his eyes, and while he consulted with a psychiatrist about feelings of anxiety, the Court does not believe that there is credible evidence linking what he claims to be his symptoms to the lighting in SMU-2.

180.  With regard to the headaches, Diaz did not submit an HNR until after he filed this lawsuit, a fact that the Court finds to be suspect.[12] Also, the mere fact that Diaz began to experience headaches while a prisoner in SMU-2 is not, by itself, strong evidence that the 24-hour lighting caused the headaches.  As Dr. McGrill testified, 80-90% of society suffers from some form of headache, and of those people, 30-50% describe their symptoms as "severe" or "debilitating."  Of the people who suffer from migraine headaches, most begin to experience them between the ages of fifteen and twenty-five.  Diaz was twenty-four years old at the time he filed his HNR.  Also, Dr. McGrill testified that over 10% of ADOC inmates she treats complain of headaches, and in her experience, there is not a disproportionately high number of SMU-2 inmates who complain of headaches.

181.  With regard to the deterioration of his vision, Diaz submitted his HNR requesting glasses the day after he was transferred to SMU-2.  One day in SMU-2 could not possibly have caused the deterioration of his eyes.  Further, his HNR alludes to previous glasses he owned in SMU-1.  While Diaz tried to justify this by saying that his eyesight began to worsen while he was in SMU-1 and SMU-1 has similar lighting to SMU-2, the testimony of Sublett revealed that SMU-1 does not have 24-hour security lighting.  Simply put, there is no reliable evidence that the lighting conditions in SMU-2 caused Diaz's eyes to deteriorate.

_____

[12]During the two-day trial, the Court was impressed with Diaz's level of intelligence. He asked probing and detailed questions, and made sophisticated legal objections despite having no legal training.  The Court does not doubt that someone as smart as Diaz would possess the wherewithal to make complaints about his health after filing his lawsuit in attempt to bolster his case.  Indeed, both the HNRs concerning his headaches and his anxiety disorder came after this action was commenced.

182.   With regard to Diaz's allegations that the lighting in SMU-2 caused him to develop an anxiety disorder, the Court finds that his subjective allegations are not credible, and are undercut by the highly persuasive testimony of Dr. Taylor.

183.   Specifically, she testified that while statements Diaz made to her at their initial meeting led her in the direction of an anxiety disorder diagnosis, Diaz's subsequent behavior caused her to change her mind. Diaz stopped taking the medications she had prescribed for him, despite reporting some success with those medications, yet he informed her that he was no longer experiencing symptoms of anxiety. It makes little sense that one would stop taking an effective medication only to have their original symptoms disappear. Other aspects of Diaz's conduct undermine a diagnosis of anxiety disorder. First, there is the fact that, in Dr. Taylor's view, it is uncommon for an individual to experience an anxiety disorder without a triggering event. In Diaz's case, he did not report symptoms of anxiety until after he filed his lawsuit and after he had been incarcerated in SMU-2 for close to three years. Second, Dr. Taylor described anxiety disorder as an uncomfortable disorder, in the sense that one who has it would likely try to take steps to eliminate it. Diaz abruptly discontinued taking the medications Dr. Taylor prescribed to him, refused additional meetings with Dr. Taylor, and did not pursue the relaxation therapy that Dr. Taylor had suggested to him. Third, the percentage of SMU-2 inmates who have been diagnosed with anxiety disorder closely correlates to the percentage of inmates in the remainder of the ADOC population who suffer from anxiety disorder. And that percentage is roughly equivalent to the percentage of people in society as a whole who suffer from anxiety disorder.

184.   With regard to Diaz's testimony that the lighting negatively affects his sleep, that testimony is not credible in light of Hubbard's observations and the fact that Diaz never submitted an HNR about his inability to sleep. Diaz was asleep close to 90% of the time he was observed by Hubbard, and, after 12:15 a.m., Hubbard observed him

1   asleep over 99% of the time.  Hubbard also observed Diaz sleeping on multiple
2   occasions while the day-use lights were activated.

3   185.   Finally, while former Director Stewart may have generally intended that the indefinite
4   segregation of validated STG members in SMU-2 serve as a deterrent to other inmates
5   contemplating involvement with STGs, that purpose has not manifested itself in the
6   decision to install 24-hour security lights.  Also, the testimony by the current members
7   of the ADOC administration uniformly rejected any suggestion that any of the
8   conditions in SMU-2 exist for the purpose of punishing validated STG members or
9   deterring potential STG members.

10  **Outdoor Exercise - Overview**

11  186.   At the time these actions were commenced, SMU-2 inmates were allotted a maximum
12  of three hours per week in the outdoor exercise area.  Several weeks before trial, that
13  policy changed.  At present, it is undisputed that SMU-2 inmates may spend up to
14  three two-hour sessions per week in the recreation area, for a total of six hours a
15  week..

16  187.   As described above, SMU-2 contains twelve clusters; each cluster contains six pods;
17  and each pod contains ten cells.  Attached to each pod is a "recreation" area used for
18  "outdoor exercise" by SMU-2 inmates.  Recreation areas are situated at one end of
19  each pod, and, in the estimation of Deputy Warden McWilliams, are about six feet
20  from the closest cell in the pod.

21  188.   There is a recreation yard within SMU-2 that contains a par course and other
22  equipment, though Deputy Warden McWilliams was unsure as to why the recreation
23  yard is not presently used for recreation by SMU-2 inmates.

24  189.   Defendants entered into evidence a videotape that depicts a typical recreation area.
25  While there were occasional suggestions by Plaintiffs that the recreation area seen in
26  the video may be different from the ones attached to their respective pods, the Court
27  rejects those suggestions.  ADOC witnesses testified that all of the recreation areas
28  are identical in their dimensions and other characteristics, with the possible exception

of the direction that they face. Baptisto noted that whereas the recreation area in the video appears to be painted, his is not. Assuming that is correct, that difference is of no consequence.

190. Each recreation area is twenty-three feet long and eleven feet wide, with eighteen foot walls. The ceiling is made of a steel fencing that allows fresh air to enter. The walls and the floor are concrete.

191. The height of the walls precludes inmates from seeing anything other than the sky above them.

192. Inmates may request a handball while in the recreation area. No other items are now, or have ever been, permitted. Deputy Warden McWilliams testified that allowing inmates to have other items could create security risks for the officers, who have the duty of transporting inmates from the recreation area back to their cells.[13]

193. Inmates may wear their prison-issued clothing while in the recreation area. They may also purchase "sweat clothing" and athletic shorts from the commissary that may be worn in the recreation area. Inmates are not entitled to purchase athletic shoes from the commissary, and must wear either their prison-issued sandals or canvas shoes. From the testimony of Deputy Warden McWilliams, it appears that inmates may also purchase sunblock from the commissary which they may apply before entering the recreation area.

194. While in the recreation area, inmates may, among other activities, do calisthenics, run, walk and play handball. In the view of Deputy Warden McWilliams, inmates are capable of engaging in meaningful exercise while in the pod.

195. Only one inmate is permitted at a time in the recreation area.

---

[13]For example, Deputy Warden McWilliams expressed concern at the damage that could be caused by a basketball, which could be used to either assault an officer or to cause damage to the metal fencing at the top of the recreational area. He has seen daggers fashioned out of chain-link fences, one of which was used in a different unit to stab an inmate in the heart. One should never underestimate the ingenuity of prisoners to design home-made weapons.

196.    Inmates are not compelled to spend any time in the recreation area.  They may use all of their two hours, some of it, or none of it.  If an inmate chooses to use none of his allotted recreation time on a particular day, the schedule is adjusted, and the inmate who was, for example, scheduled to use the second block of recreation time would be moved up to the first.

197.    According to Deputy Warden McWilliams, it is not unusual for inmates to refuse their recreation time.

198.    An inmate does not have the option of leaving the recreation area then returning during the same two hour period.  Once they leave, they cannot return until their next scheduled time.

199.    Inmates may shower after each session in the recreation area.  An inmate who refuses his time in the recreation area still has the option of showering.

200.    Inmates are informed of their scheduled recreation time by a monthly SMU-2 newsletter that is distributed to all SMU-2 inmates.  Scheduled recreation times vary on a day-to-day basis.  Inmates are aware of their scheduled recreation time at least one week in advance.

201.    On any given day, half of a pod - i.e., five cells - will have the option of recreation time.

202.    There appears to be a dispute as to the time of day when recreation begins and ends.  Based on the daily log of SMU-2 activity, it appears that the earliest time of day that recreation time can begin is 8:30 a.m.  However, Deputy Warden McWilliams testified that recreation time can begin as early as 6:30 a.m. or 7:00 a.m., and end as late as 4:00 or 5:00 p.m.  Using simple math, if there are five inmates per day that are entitled to recreation time, each for two hours, then each recreation area has the potential to be occupied for ten hours per day.  Excluding the time it takes to transport inmates to and from the recreation area, if recreation time began at 7:00 a.m. and all five inmates used their full allotment, recreation time would conclude by 5:00 p.m.

203. According to Deputy Warden McWilliams, the constant rotation of the recreation times exists to ensure equal exposure to the sun.  For example, Florence, Arizona, where SMU-2 is located, is extremely hot in the summer, such that direct exposure to the sunlight in the middle of the afternoon might be undesirable.  At such times of the year, an early morning recreation time, when the temperature remains under 100 degrees, might be preferable.  Conversely, during the winter, the temperature in the early morning might be fairly cold, and an afternoon recreation time would be more desirable.

204. There is no dispute that at certain times of day and at certain times of the year, the sun is not directly visible from the recreation areas.  Deputy Warden McWilliams agreed that in the winter months, it would be "difficult" for particular recreation areas to have "long periods of time where [the sun] hits the bottom concrete," though in the summer, those conditions would be "drastically different."

205. However, he conceded that if members of a particular pod consistently refused their recreation time, an occurrence that he did not appear to believe was uncommon, the inmates in that pod who did wish to make use of their recreation time could be forced into the recreation area early in the day. Deputy Warden McWilliams seemed to agree that a possible solution to this problem would be to create recreation schedules in which an inmate's scheduled recreation time would be unaffected by the refusals of other inmates in his pod.

206. Inmates are permitted to exercise in their cells.

**Outdoor Exercise - Baptisto**

207. Baptisto described the recreation area as a "big empty cell."  To see the sky, he is forced to "look straight up," which he claims he cannot do for extended periods because it strains his neck.

208. Baptisto exercises while in his cell, sometime "non-stop exercises for an hour." His exercise regimen includes pushups, dips, and pushups performed while in a hand-stand position.

209.   While in his recreation area, Baptisto performs the same types of exercises, and also walks.

210.   Baptisto testified that the handball usually is not in the recreation area when he enters, and his requests for it often go unfulfilled.

211.   Baptisto did not testify as to any adverse impact the allegedly insufficient amount of outdoor exercise has had on him, either mentally or physically.  Nor has he filed HNRs concerning any ailment that could be attributed to a deprivation of a sufficient amount of outdoor exercise.

212.   To the extent that the hallucinations he alleges he experienced relate to this condition of his confinement, the Court has significant doubts about Baptisto's credibility in that regard, for the reasons expressed in the section of this Order concerning the impact on Baptisto of the lighting conditions.

213.   In other words, there is no credible evidence that Baptisto has suffered or will suffer any adverse mental or physical impact as a result of his alleged deprivation of sufficient outdoor exercise time.

**Outdoor Exercise - Mullins**

214.   Mullins's testimony concerning the issue of whether he is provided a sufficient amount of outdoor exercise consisted of the following: "As far as back door cells, I believe that they don't provide actual outdoor exercise or access to year round access to sunlight. . . .  Mr. McWilliams testified yesterday . . . that certain back door cells can go months without actually getting sunlight directly into them depending on the time of year, more so in the summer than the winter."

215.   Mullins did not testify that he has suffered any adverse mental or physical effects from this condition of confinement, nor has he filed any HNRs that would support such an argument.

**Outdoor Exercise - Diaz**

216.   Diaz's testimony concerning this issue consisted of the following: "SMU-2 has no real outdoor exercise or recreation area.  The rec pen is nothing more than another cell that

is part of the pod itself.  I have no access to exercise clothing, nor equipment, and/or any of the most minimal necessities for safe or proper exercise.  Due to . . . the limited access of outdoor recreation, I feel that my health has been affected. . . .  Contrary to earl[ier] testimony that inmates are able to run in this recreation pen, it's not true.  We cannot jog or run out there. . . . [T]he space is far too small."

217.   Diaz also testified that he is often prevented from using his recreation time by virtue of the fact that recreation time can occur early in the morning, when it is too cold to go outside.  This problem is exacerbated, according to Diaz, by the fact that he has been unable to afford "sweat clothes" that are on sale in the commissary.

218.   When inmates choose not to make use of their recreation time, that refusal is noted in a log maintained by SMU-2 corrections officers.

219.   Diaz's log for several months was entered into evidence as Exhibit 86B.   It is summarized here:

| Time Period | Total Possible Number of Rec. Sessions | Total Refusals of Rec. Sessions. | Total Possible Number of Showers | Total Showers Refused. |
|---|---|---|---|---|
| 6/04 - 8/04 | 39 | 3 | 39 | 1 |
| 9/04 - 11/04 | 39 | 11 | 39 | 0 |
| 12/04 - 2/05 | 39 | 27 | 39 | 2 |

220.   When Diaz was asked about these numbers, he generally attributed his refusals to the combination of cold temperatures and lack of warm clothes.

221.   However, on cross-examination, Diaz conceded that in his deposition taken in connection with this case in December 2004, he admitted that he had purchased sweat clothing.

222.   Apart from Diaz's allegations of vision loss, headaches and anxiety that were discussed in connection with the lighting, Diaz does not allege any additional adverse mental or physical effects stemming from this condition of confinement.

223.   To the extent that Diaz argued that his alleged vision loss, headaches, or anxiety symptoms are attributable to a lack of exercise or fresh air, the Court incorporates its

1    discussion of those allegations from the section of this Order concerning the impact

2    of the SMU-2 lighting conditions on Diaz.

3    224.   In sum, the Court believes that there is no credible evidence that Diaz has suffered or

4    will suffer any adverse mental or physical effects as a result of any alleged

5    deprivation of sufficient outdoor exercise time.

6    225.   The Court also has significant doubts about Diaz's claims that the weather frequently

7    precludes him from making use of the recreation area.  Initially, Diaz stated that he

8    frequently declined to use the recreation area in the winter at least in part because he

9    lacked sweat clothing.  However, he did have sweat clothing during that time yet still

10   chose not to go outside.  While it may be the case that it was too cold to go outside

11   even with sweat clothing, that was not Diaz's testimony.  Instead, he chose to attribute

12   his refusals to his lack of sweat clothing when in fact he was in possession of sweat

13   clothing.  It is possible that Diaz refused his recreation time knowing that it could

14   bolster his claim in the instant litigation.  It is also possible that Diaz simply prefers

15   not to go outside in colder weather.  Whatever the case, the Court does not believe

16   that Diaz was actually precluded from taking advantage of his recreation time because

17   of the weather.

18                              **CONCLUSIONS OF LAW**

19   **General Principles**

20   1.     The Eighth Amendment of the United States Constitution prohibits "cruel and unusual

21   punishment."  U.S. Const. amend. VIII.

22   2.     "[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual

23   punishment forbidden by the Eighth Amendment."  *Whitley v. Albers*, 475 U.S. 312,

24   319, 106 S. Ct. 1078, 1085 (1986) (some internal quotation marks omitted).  "Among

25   'unnecessary and wanton' inflictions of pain are those that are totally without

26   penological justification." *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S. Ct. 2392,

27   2399 (1981) (some internal quotation marks omitted).

28

3.       To prove an Eighth Amendment violation, an inmate must satisfy a two-part test that consists of an objective prong and a subjective prong. *Hallett v. Morgan,* 296 F.3d 732, 744 (9th Cir. 2003); *Madrid v. Gomez,* 889 F. Supp. 1146, 1245-46 (N.D. Cal. 1995).

4.       Under the objective prong, the inmate must show that the conditions of his incarceration deny him "the minimal civilized measure of life's necessities." *Rhodes,* 452 U.S. at 347, 101 S. Ct. at 2399; *Keenan v. Hall,* 83 F.3d 1083, 1089 (9th Cir. 1996) (citing *Rhodes,* 452 U.S. at 337, 101 S. Ct. at 2399).

5.       The subjective prong requires the inmate to demonstrate that the deprivation was a product of "deliberate indifference" by prison personnel. *Wilson v. Seiter,* 501 U.S. 294, 302-03, 111 S. Ct. 2321, 2326-27 (1991) (citations omitted); *Keenan,* 83 F.3d at 1089 (citing *Wilson,* 501 U.S. at 302-03, 111 S. Ct. at 2326-27). Such indifference, which is akin to the state of mind required for criminal recklessness, *see Madrid,* 889 F. Supp. at 1246, can occur only if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S. Ct. 1970, 1979 (1994). In other words, the defendant must "consciously disregard a substantial risk of serious harm." *Madrid,* 889 F. Supp. at 1246. "This 'subjective approach' focuses only 'on what a defendant's mental attitude actually was.'" *Toguchi v. Chung,* 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 839, 114 S. Ct. at 1977).

6.       An inmate who can prove that prison officials acted with the specific intention to punish the inmate satisfies the subjective prong. *See, e.g., Robins v. Meecham,* 60 F.2d 1436, 1440 (9th Cir. 1995).

7.       Whether a particular prison condition satisfies the objective prong constitutes an issue of law, *Madrid,* 889 F. Supp. at 1246 (citing *Hickey v. Reeder,* 12 F.3d 754, 756 (8th Cir. 1993)), while a defendant's state of mind is a question of fact and is "subject to

1    demonstration in the usual ways, including inference from circumstantial evidence."

2    *Madrid,* 889 F. Supp. at 1246 (quoting *Farmer,* 511 U.S. at 827, 114 S. Ct. at 1974).

3    **Food**

4    8.    The Eighth Amendment requires that prisoners be provided with "adequate food."

5    *Keenan,* 83 F.3d at 1091 (citing *Hoptowit v. Ray,* 682 F.2d 1237, 1246 (9th Cir.

6    1982)).  "While prison food need not be 'tasty or aesthetically pleasing,' it must be

7    adequate to maintain health." *Keenan,* 83 F.3d at 1091 (quoting *Lemaire v. Maass,*

8    12 F.3d 1444, 1456 (9th Cir. 1993)).

9    9.    Here, Baptisto's claim that prison officials caused him to become malnourished fails

10   both the objective and subjective prongs of the test.

11   10.   Under the objective prong of the test, there is not a scintilla of credible evidence that

12   Baptisto is malnourished; to the contrary, he is served a nutritionally-balanced 2,800

13   calorie per day diet that is ample for his sedentary lifestyle.

14   11.   As described in the Court's Findings of Fact, the 2,800 calorie SMU-2 diet, which is

15   formulated by a dietician based on federally-recommended nutritional values and

16   takes into account the sedentary lifestyle in SMU-2, is easily sufficient for a person

17   of Baptisto's weight, age, size and sedentary lifestyle.  A more caloric diet, according

18   to the testimony of the ADOC dietician and physician, could negatively impact

19   Baptisto's health by leading to weight gain, heart problems and diabetes.

20   12.   The only evidence that Baptisto is malnourished came from Baptisto himself during

21   trial, but those statements are unsupported by the evidence.  His blood tests revealed

22   no evidence of malnutrition, and he never submitted an HNR for anything relating to

23   malnutrition, despite submitting multiple HNRs for other health issues, such as

24   problems with his teeth.

25   13.   Further, while Baptisto lost weight after his transfer to SMU-2, that drop was actually

26   beneficial to his health.  While his pre-SMU-2 weight far exceeded the range of that

27   which is healthy for someone of his size, the SMU-2 diet has brought Baptisto within

28   the proper range.  Any suggestion that Baptisto's weight will continue to drop below

that which is healthy is undercut by the fact that Baptisto has sometimes gained weight during particular stretches in SMU-2. *See Lemaire,* 12 F.3d at 1246 (noting that the fact that the prisoner gained weight while forced to eat Nutraloaf cast doubt on his argument that Nutraloaf had caused him to become malnourished).  Also, the forty-pound drop in Plaintiff's weight, which occurred over a three-year period, did not transpire at an unreasonably rapid pace, according to the testimony of Dr. McGrill.

14.    In sum, Baptisto "is being fed, and he is being fed adequately." *Id.*

15.    In light of the Court's conclusion that Baptisto has failed the objective prong of the test, the Court is not required to reach the subjective prong. *See id.*  However, even assuming Baptisto meets the objective prong, he fails the subjective prong.

16.    Baptisto argues that this prong is satisfied by Defendants' intention to punish him through his diet.  However, there is no evidence that the SMU-2 diet is the product of a punitive intention by ADOC officials.  As mentioned above, while some language in former Director Stewart's deposition in connection with a previous action could be taken to mean that he implemented D.O. 806 to deter other ADOC inmates from joining STGs, there is no evidence that his possibly punitive intention manifested itself in the SMU-2 diet.  In fact, Stewart himself stated at his deposition that the lower calorie diet exists out of consideration for the sedentary lifestyle in SMU-2. Moreover, all current ADOC officials who testified at trial and had personal knowledge of the SMU-2 diet gave no indication that the diet exists to punish SMU-2 inmates or deter other inmates from joining STGs.  Nor is there any aspect of the diet itself that gives rise to the inference that it is influenced by a punitive state of mind.

17.    Rather, the diet is motivated exclusively by the valid penological justification of serving inmates a healthy diet commensurate with their level of physical activity.

18.    Finally, because the SMU-2 diet poses no risk whatsoever to the health of SMU-2 inmates, it would be impossible for Defendants, or for any ADOC official, to deliberately disregard those risks or to be deliberately indifferent to them.

**Lighting**

19. "Adequate lighting is one of the fundamental attributes of 'adequate shelter' required by the Eighth Amendment." *Keenan,* 83 F.3d at 1090 (citing *Hoptowit v. Spellman,* 753 F.2d 779, 783 (9th Cir. 1985)). "There is no legitimate penological justification for requiring [inmates] to suffer physical and psychological harm by living in constant illumination. This practice is unconstitutional." *Keenan,* 83 F.3d at 1090 (quoting *Lemaire v. Maass,* 745 F. Supp. 623, 636 (D. Or. 1990), *vacated on other grounds,* 12 F.3d at 1458-59).

20. The lighting conditions in SMU-2 pass constitutional muster under both the objective and subjective prongs of the analysis.

21. Turning first to the objective prong, the caselaw is relatively sparse in explaining what constitutes adequate lighting, and most cases on this topic explore the issue of whether daytime lighting is unconstitutionally dim. *See, e.g., Martino v. Carey,* 563 F. Supp. 984, 1000 (D. Or. 1983) (collecting cases and noting that Eighth Amendment violation can occur when prisoners are not provided with adequate light to conduct "normal activities of life").

22. In such cases, courts have found lighting conditions to be inadequate if they cause inmates to suffer "health problems, including headaches, eye strain and fatigue." *Loya v. Bd. of County Com'rs of Bannock County, Idaho,* 1992 WL 176131, at *2 (D. Idaho May 4, 1992); *Hoptowit,* 753 F.2d at 783.

23. In one of the few cases involving allegedly too much light, the Ninth Circuit affirmed the denial of summary judgment for both parties where the inmate alleged that "large fluorescent lights directly in front of and behind his cell shone into his cell 24 hours a day, so that his cell was constantly illuminated, and [the inmate] had no way of telling night or day, . . . caus[ing] him grave sleeping problems and other mental and psychological problems." *Keenan,* 83 F.3d at 1090-91 (internal punctuation omitted). *See also Eccleston v. Oregon,* 2004 WL 2538304, at *5 (D. Or. Nov. 9, 2004)

1    (granting summary judgment in favor of prison where five watt bulb in each cell in

2    maximum security unit was illuminated all night).

3    24.   Here, the conditions in SMU-2 are a far cry from those in *Keenan* and more akin to

4    those in *Eccleston*.

5    25.   The sole source of light in the cells at night is a 24-hour security light.  An inmate

6    sleeping on his bed with his head at the end of the bed farthest from the light receives

7    a mere .21 foot candles of light.  Even if an inmate opts to sleep with his head closest

8    to the wall to which the security light is attached, his eyes will see only .29 foot

9    candles of light.  Either way, inmates may sleep with something over their eyes so

10    long as the officer performing the hourly checks can determine that the prisoner is

11    breathing.  This minimal amount of light, which is similar to that which is given off

12    by a nightlight, is insufficient to satisfy the objective prong of the analysis.

13    26.   Moreover, none of the Plaintiffs have experienced any adverse mental or physical

14    effects as a result of the lighting, and they offered no evidence that they are at risk to

15    do so.

16    27.   While all three Plaintiffs testified otherwise, as discussed above, the Court gives little

17    weight to their testimony.  Neither Baptisto nor Mullins submitted even one HNR

18    concerning any mental or physical ailment traceable to the lighting conditions.

19    Mullins did not provide an explanation for his failure to do so, and Baptisto's

20    explanation - his fear that prison officials were "out to get him" - is fatally

21    undermined by his submission of multiple HNRs about other issues, all of which led

22    to adequate medical treatment.  Their credibility is also weakened by the sheer

23    dimness of the security light and the fact that they are permitted to cover their eyes

24    while they are sleeping.

25    28.   Diaz testified that the lighting prevented him from sleeping, gave him headaches,

26    caused vision loss, and led to the development of anxiety disorder.  As discussed

27    above, the Court accords no weight to this testimony or the evidence alleged to

28    support it.

29.  The Court does not credit Diaz's testimony that the lighting conditions in SMU-2 caused his vision to deteriorate such that he now wears glasses because, as discussed more fully above, he wore glasses even before his transfer to SMU-2, and he submitted an HNR concerning his deteriorating vision only one day after his transfer to SMU-2.  Also, there is no evidence in the record that shows a link between the presence of a nightlight during sleeping hours and ocular degeneration.

30.  Nor does the Court credit Diaz's testimony that the lighting conditions in SMU-2 caused him to develop headaches because, as discussed more fully above:  Diaz did not submit an HNR concerning his headaches until after he filed his lawsuit; according to Dr. McGrill, there is no credible evidence establishing a link between the lighting conditions and Diaz's headaches; there is no credible evidence generally linking the lighting to headaches; and SMU-2 inmates do not experience a disproportionately high number of headaches compared to both the general ADOC population and society at large.  *See Davenport v. DeRobertis,* 653 F. Supp. 649, 655 (N.D. Ill. 1987), *aff'd in part and rev'd in part,* 844 F.2d 1310 (7th Cir. 1988) (affirming Eighth Amendment jury verdict in favor of inmates housed in maximum security segregation unit who were allowed as little as one hour per week of outdoor exercise, and where inmates consumed 25% more medical services than inmates in the general inmate population, and committed and attempted to commit suicide at a higher rate than the general inmate population).  Moreover, even if there was evidence that the lighting conditions caused Diaz to experience headaches, it would be insufficient to satisfy the objective prong, as the headaches do not pose a serious health risk, and they are easily treated through proper medication.

31.  The Court also chooses not to accord significant weight to Diaz's testimony that the lighting conditions in SMU-2 have impacted his ability to sleep because, as discussed more fully above: the light emitted by the seven watt security bulb is minimal; and observations by C.O. II Hubbard reveal that, over an eight-month period, Diaz was

1    asleep 99% of the time after 12:15 a.m., and almost 90% of the time during the hours
2    that the day-use lights are deactivated.

3    32.   Finally, Diaz's testimony that the lighting conditions in SMU-2 caused him to develop
4          anxiety disorder is highly implausible because, as discussed more fully above: Dr.
5          Taylor, his treating psychiatrist, believed that Diaz never had an anxiety disorder; that
6          disorder does not afflict a higher percentage of SMU-2 inmates than the ADOC
7          population generally or society at large, *see Davenport,* 653 F. Supp. at 655; Dr.
8          Taylor did not believe that there is a link between the conditions of confinement in
9          SMU-2 and anxiety disorder; and Diaz presented no evidence apart from his own
10         testimony to the contrary.

11   33.   The subjective prong of the analysis focuses on Defendants' state of mind in choosing
12         to install the 24-hour security lights.   In that regard, the evidence is overwhelming
13         that Defendants implemented the SMU-2 lighting conditions for the sole purpose of
14         protecting the security of officers who perform hourly health and welfare checks of
15         SMU-2 cells during the hours that the day-use lights are off.  There is no evidence
16         that Defendants have acted with deliberate indifference to Plaintiffs' health or safety,
17         at least in part because there is no evidence that the lighting conditions, and in
18         particular, the 24-hour security light, have actually caused any health problems either
19         to Plaintiffs or other SMU-2 inmates.

20   34.   The Court accepts Defendants' explanation that it would be unsafe for officers to
21         approach a pitch black cell with only a flashlight.  Not only would the flashlight leave
22         numerous blind spots in a cell, but it would actually be more disruptive to sleeping
23         inmates to have a flashlight shined in their faces once an hour.

24   35.   These security concerns are especially compelling in light of the fact that validated
25         STG members such as those housed in SMU-2 are among the most violent and
26         predatory in the ADOC prison population, with a long history of attacks on
27         corrections officers.

28

36.   The evolution of the lighting conditions from SMU-1 to SMU-2 underscores the conclusion that the presence of the 24-hour light is motivated exclusively by security concerns.  When the ADOC was in the process of planning and constructing SMU-2, it solicited feedback from officers as to how the new facility could be improved. Officers suggested that whereas flashlights were used to perform hourly checks in SMU-1, the safety of the officers could be improved through the use of security lights in lieu of flashlights.

37.   To the extent that aspects of former Director Stewart's deposition could be read as evidencing his view that the conditions in SMU-2 were created to punish validated STG members or deter other inmates from joining STGs, there is no evidence that this intention was borne out in the SMU-2 lighting conditions.  Nor does the Court believe that a fair reading of Stewart's deposition compels the conclusion that he intended to harm SMU-2 inmates through the STG policy that he implemented.  He specifically stated that "I do not believe that [SMU-2] impacts . . . the mental health [of validated STG members]."  (Stewart Depo. at 22.)

38.   Finally, there is a dispute of fact as to whether it would be possible for officers to turn on the security lights only for the approximately three minutes it takes to perform an hourly check of each pod.

39.   Regardless of whether it is possible, it is irrelevant to the Court's ultimate conclusion. The existence of what Plaintiffs believe to be a more desirable or comfortable alternative is not evidence that the current conditions are unconstitutional.  *See, e.g., Delaney v. DeTella,* 256 F.3d 679, 683 (7th Cir. 2001) ("[T]he Constitution does not require prisons to be comfortable."); *Harris v. Fleming,* 839 F.2d 1232, 1235 (7th Cir. 1988).  An Eighth Amendment violation does not occur simply because prison officials have failed to avail themselves of the most comfortable or desirable procedures.  *See, e.g, Davenport,* 844 F.2d at 1315 ("It cannot be right that the least comfortable prison conditions in the United States automatically violate the Constitution; for then, by the inevitable progression of successive cases, *all* conditions

1    other than the most comfortable would be found to violate it.") (citation omitted)

2    (emphasis in original).

3    40.   For the reasons discussed above, the lighting conditions pass constitutional muster

4          under both the objective and subjective prongs of the test.

5    **Outdoor Exercise**

6    41.   Outdoor exercise is "one of the basic human necessities protected by the Eighth

7          Amendment." *Lemaire,* 12 F.3d at 1456; *Wilson,* 501 U.S. at 303, 111 S. Ct. at 2327.

8    42.   "Deprivation of outdoor exercise violates the Eighth Amendment rights of inmates

9          confined to continuous and long-term segregation." *Keenan,* 83 F.3d at 1090

10         (citations omitted); *Allen v. Sakai,* 40 F.3d 1001, 1004 (9th Cir. 1994); *Spain v.*

11         *Procunier,* 600 F.2d 189, 199 (9th Cir. 1979) (Kennedy, J.) (collecting cases and

12         observing that, "[t]here is substantial agreement among the cases in this area that

13         some form of regular outdoor exercise is extremely important to the psychological and

14         physical well being of the inmates."); *Davenport,* 653 F. Supp. at 656-57 (collecting

15         cases).

16   43.   In assessing the constitutionality of outdoor exercise regimes, courts generally eschew

17         bright-line rules as to the number of hours of outdoor exercise to which inmates are

18         entitled.  *See Davenport,* 844 F.2d at 1315 (noting, however, that "we are impressed

19         by the number of decisions that hold or suggest that a failure to provide inmates . . .

20         with the opportunity for at least five hours a week of exercise outside the cell raises

21         serious constitutional questions") (citations omitted); *Caldwell v. Miller,* 790 F.2d

22         589, 600 (7th Cir. 1986) ("The Eighth Amendment does not provide a fixed formula

23         for determining whether the effect of particular conditions constitutes cruel and

24         unusual punishment. . . .").

25   44.   Each case requires its own fact-specific inquiry.  Relevant considerations in that

26         regard include: testimony by inmates, prison personnel, medical personnel and other

27         witnesses, lay and expert, concerning the impact of the exercise regime on inmates'

28         mental and physical well-being; "current and enlightened scientific opinion as to the

conditions necessary to insure good physical and mental health for prisoners," *Spain,* 600 F.2d at 200; evidence of actual mental or physical harm incurred by inmates; the duration of the confinement; the physical layout of the outdoor exercise area; the quality of the outdoor exercise; the size of the inmate's cell and the opportunity for in-cell exercise; and the existence of other out-of-cell activities such as attending educational or vocational programs, going to the law library, and meeting with visitors.  *See Lemaire,* 12 F.3d at 1458; *Wishon v. Gammon,* 978 F.2d 446, 449 (8th Cir. 1992); *Davenport,* 844 F.2d at 1315; *Peterkin v. Jeffes,* 855 F.2d 1021, 1028-29 (3d Cir. 1988); *Madison County Jail Inmates v. Thompson,* 773 F.2d 834, 844 (7th Cir. 1985); *Ruiz v. Estelle,* 679 F.2d 1115, 1150-52 (5th Cir. 1982); *Sweet v. S.C. Dep't of Corrs.,* 529 F.2d 854, 865-66 (4th Cir. 1975); *Spain v. Procunier,* 408 F. Supp. 534, 537-38, 541-44 (N.D. Cal. 1976), *aff'd in part, rev'd in part,* 600 F.2d at 189; *Davenport,* 653 F. Supp. at 655-58; *Hutchings v. Corum,* 501 F. Supp. 1276, 1283-84, 1293-94 (D.C. Mo. 1980); *Frazier v. Ward,* 426 F. Supp. 1354, 1367-68 (N.D.N.Y. 1977) (according "great weight" to the testimony of five experts that outdoor exercise should be permitted for at least one hour per day for five days).

45.   In *Spain,* the Ninth Circuit affirmed a district court order requiring that inmates housed in the Adjustment Center ("AC")[14] of the California State Prison at San Quentin be accorded five, one-hour sessions of outdoor exercise per week, "unless inclement weather, unusual circumstances or disciplinary needs made that

---

[14]The AC is used "primarily to segregate and discipline disruptive prisoners."  *Spain,* 600 F.2d at 102.  As in SMU-2, AC inmates "were in continuous segregation, spending virtually every day in their cells with meager out-of-cell movements and corridor exercise. Their contact with other persons was minimal.  The district court found that, '[p]laintiffs live in an atmosphere of fear and apprehension and are confined under degrading conditions without affirmative programs of training or rehabilitation and without possible rewards or incentives from the state which will give them a semblance of hope for their transfer out of the AC."  *Id.* (quoting *Spain,* 408 F. Supp. at 545).  Unlike SMU-2, AC inmates prior to the district court's injunction were "never permitted any yard or outdoor privileges or exercise whatsoever."  *Spain,* 408 F. Supp. at 543.  Following the injunction, it is unclear where the outdoor exercise occurs.

1   impossible." *Spain,* 600 F.2d at 199.  Before the district court, the plaintiffs offered

2   the testimony of multiple physicians, including the Medical Director of the San

3   Francisco County Jail and the Director of the Security Ward at San Francisco General

4   Hospital, that the conditions of confinement adversely affected the plaintiffs' health.

5   *Spain,* 408 F. Supp. at 538.  "Psychiatric and psychological experts testified that AC

6   conditions threaten to dehumanize plaintiffs and have already damaged plaintiffs in

7   ways that will only be fully known after they are released." *Id.*

8   46.   Turning to the present case, the Court's analysis begins by noting the glaring absence

9          of evidence in the record concerning the effects or potential effects of the alleged lack

10         of adequate outdoor exercise on these particular Plaintiffs and on SMU-2 inmates

11         more generally.

12   47.   In every case of which the Court is aware in which inmates secured injunctive relief

13         concerning the sufficiency of their outdoor exercise or exposure to sunlight and fresh

14         air, there was significant evidence presented by medical experts on this subject.  *See*

15         *Spain,* 408 F. Supp. at 538; *Frazier,* 426 F. Supp. at 1367-68.  In *Davenport,* the

16         medical director of the prison "testified that segregation inmates consume 25% more

17         medical services than inmates in the general population. [The segregation unit's]

18         health services reports show that generally 15% to 30% (and in one month 71%) of

19         the inmates examined each month by physician's assistants were segregation inmates,

20         although the segregation unit housed only 10% of the more than 2,000 inmates."

21         *Davenport,* 653 F. Supp. at 655.  There was also testimony that "suicide and suicide

22         attempts are more common in the segregation unit than in the general population."

23         *Id.*  The Medical Director of the Illinois Department of Corrections testified that one

24         hour per week of out-of-cell exercise is "medically unacceptable because it can lead

25         to deterioration of the cardio-vascular system, hardening of the arteries, atrophy of

26         muscles, musculo-skeletal problems, and adverse psychological effects." *Id.* at 655-

27         56.  Another doctor testified that "there is correlation noted in the professional

28

literature, between prolonged isolation and various psychopathological symptoms." *Id.* at 656.

48.  The medical evidence in this case consisted entirely of the testimony of Drs. Taylor and McGrill.  Neither of them believed that there was a link between any of the conditions of confinement in SMU-2 and physical or mental deterioration.  Dr. McGrill conceded that it is possible that the absence of sufficient exercise could cause migraines, and Dr. Taylor agreed that "anything" could conceivably cause anxiety disorder, though neither doctor went so far as to say that, in their experience, the particular conditions of confinements in SMU-2 caused or were likely to cause those problems.  The doctors also noted that in their experience treating both SMU-2 inmates and inmates from the general ADOC inmate population, the former have not consumed a disproportionately large number of medical services, and the proportion of SMU-2 inmates who suffer from medical and psychological problems equates to the proportion of individuals both in the ADOC generally and society generally who suffer from the same problems. *See Davenport,* 653 F. Supp. at 655.

49.  With regard to the inmates who commenced this litigation, the doctors did not believe that the alleged ailments claimed by those inmates were attributable to the conditions of confinement.  As discussed more fully above, neither Baptisto nor Mullins submitted any HNRs concerning any issue that could be associated with deprivation of outdoor exercise.  Diaz did submit such HNRs, but, as discussed above, none of them provide reliable evidence that any of his alleged afflictions can be traced to the conditions of his confinement.

50.  Absent any credible evidence of harm or potential harm to either Plaintiffs or SMU-2 inmates generally, it is difficult to conclude that the outdoor exercise provided to SMU-2 inmates creates problems of a constitutional dimension.

51.  Other evidence admitted at trial militates against the finding of an Eighth Amendment violation.  First, there is the number of hours SMU-2 inmates are permitted to be in the recreation area.  While inmates were permitted only three hours at the time these

suits were commenced, they may now spend six hours per week in the recreation area. Other courts, including the Ninth Circuit, have generally found five hours of recreation time per week to be constitutionally sufficient. *See, e.g., Spain,* 600 F.2d at 199-200; *Davenport,* 844 F.2d at 1315; *French v. Owens,* 777 F.2d 1250, 1255-56 (7th Cir. 1985); *Ruiz,* 679 F.2d at 1151-52; *Campbell v. Cauthron,* 623 F.2d 503, 507 (8th Cir. 1980) (pre-trial detainees); *Sweet,* 529 F.2d at 865-66; *Frazier,* 426 F. Supp. at 1367-69.  Other courts have approved far less.  *See Hosna v. Groose,* 80 F.3d 298, 306 (8th Cir. 1996) (approving three hours per week for inmates in long-term administrative segregation unit with conditions similar to those in SMU-2); *Wishon,* 978 F.2d at 448 (approving forty-five minutes per week of outdoor exercise for inmate in protective custody unit where inmate "did not suffer any injury or decline in health resulting from his limited out-of-cell exercise time"); *Bailey v. Shillinger,* 828 F.2d 651, 653 (10th Cir. 1987) (approving one hour per week, though little description is provided as to the other conditions of confinement); *Eccleston,* 2004 WL 2538304, at *5 (granting summary judgment in favor of prison where inmates confined in maximum security unit were permitted forty minutes of exercise for five days per week).

52.    Second, the recreation area itself, while perhaps not ideal from the perspective of exposure to the natural world, does allow SMU-2 inmates the opportunity to breathe in fresh air, feel the sunlight, and engage in meaningful exercise such as running, playing with a handball, and performing calisthenics.  While there may be some days when the weather conditions might make outdoor exercise uncomfortable or when the sun might not shine directly into the recreation area, prison officials compensate by frequently rotating the recreation schedule and allowing inmates to purchase sweat clothes which can be worn in the recreation area.  Additionally, inmates are advised of their scheduled recreation time at least one week in advance so that they may hydrate themselves to prepare for the heat, or make other preparations such as putting on sunblock.

53.   Third, there is sufficient space in SMU-2 cells to exercise.  Baptisto testified that he sometimes exercises for up to an hour at a time in his cell by doing pushups, situps and dips.

54.   Some considerations weigh in Plaintiffs' favor.  First, SMU-2 inmates have some, but generally very little, time outside of their cells apart from when they are in the recreation area.  They may see visitors for up to two hours per week, and they are allowed one five-minute phone call per week.  While they have access to counselors with whom they may speak face-to-face five times per week, it seems unlikely that those meetings occur outside of the cell.  Inmates may not leave their cells for work, vocational or educational programs, and they may not visit the library.

55.   Another consideration bearing on the constitutionality of the outdoor exercise conditions is the duration of confinement in SMU-2.  *See Hoptowit,* 682 F.2d at 1258 (noting that, "in considering whether a prisoner has been deprived of his rights, courts may consider the length of time that the prisoner must go without those benefits.  The longer the prisoner is without such benefits, the closer it becomes to being an unwarranted infliction of pain," and comparing *Spain,* 600 F.2d at 199, where the Ninth Circuit held that the "Eighth Amendment requires prisoners confined to their cells 24 hours a day to have regular exercise," to *Hayward v. Procunier,* 629 F.2d 599, 603 (9th Cir. 1980), where the court held that "such outdoor exercise can be temporarily denied when prison conditions warrant.").

56.   In SMU-2, while validated STG members have always held the keys to their cells in the sense that they could debrief at any moment, the Step-Down Program provides another potential avenue of release from SMU-2.  Validated STG members can secure their transfer out of SMU-2 by demonstrating over a four-year period that "they are no longer involved with STG activity." (D.O. 806.08(1.1).)  Even under that policy, validated STG members confined in SMU-2 will measure their stay in that facility in years, not days, weeks or months.  Nonetheless, the Step-Down Program seems likely

1    to provide inmates with "a semblance of hope" for their transfer out of SMU-2.

2    *Spain,* 600 F.2d at 199.

3   57.   Third, it is undisputed that inmates do not necessarily receive direct sunlight during

4         every session in their particular recreation area.  During the winter months, Deputy

5         Warden McWilliams agreed that it would be "difficult" for recreation areas to receive

6         direct sunlight for "long periods of time."  He also agreed that many SMU-2 inmates

7         refuse their recreation time, and it was possible that if multiple inmates in a pod

8         continually refused their recreation time, the inmates in that pod who actually wanted

9         to use their recreation time may be forced into the recreation areas during the earlier

10        parts of the day.  During Mullins's examination of Deputy Warden McWilliams,

11        Mullins stated that he had not seen sunlight in "about six months," though that

12        statement was not made under oath.

13  58.   On balance, the Court believes that Plaintiffs have failed to meet the objective prong

14        of the analysis and therefore cannot sustain their Eighth Amendment claims.  Most

15        persuasive to the Court in this regard is the absence of any evidence of harm or

16        potential harm to these Plaintiffs, the absence of evidence of harm or potential harm

17        to SMU-2 inmates generally, and the fact that SMU-2 inmates may spend six hours

18        per week in a recreation area in which they can breathe fresh air, occasionally feel

19        sunlight and engage in meaningful exercise.  While the six hours per week in the

20        recreation area constitutes the bulk of SMU-2 inmates' out-of-cell time, the Ninth

21        Circuit in *Spain v. Procunier* upheld a district court order requiring five hours per

22        week of outdoor exercise where prisoners "were in continuous segregation, spending

23        virtually 24 hours every day in their cells with only meager out-of-cell movements

24        and corridor exercise."  *Id.*  In fact, the conditions in SMU-2 seem superior to those

25        in San Quentin, which was described as a "disgraceful dungeon . . . incompatible with

26        fundamental and minimal standards of decency and humanity."  *Spain,* 408 F. Supp.

27        at 537 n.2.

28

59.     Plaintiffs' most compelling argument is the fact that, in some sense, inmates are at the mercy of the other members of their pod in determining the time of day that recreation time occurs.   If an inmate happens to reside in a pod where the other inmates consistently refuse their recreation time, that inmate may essentially be forced to take his recreation time in the early morning hours.   During the winter months, when the recreation areas receive less sunlight, it is conceivable that an inmate could go without sunlight for long periods of time.   Of course, the flip side is that during the summer months, where temperatures can exceed 120 degrees, it appears highly desirable to be in the recreation area without the blazing desert sun directly overhead.   Deputy Warden McWilliams did not seem to dispute that a solution to this problem would be to schedule inmates for fixed times in the recreation areas.   The Court does not doubt that such a solution may be preferable from the perspective of the inmates.   However, the Constitution does not compel that solution.   The mere possibility that a situation can arise in which an inmate must go without sunlight for a given period while still being able to breathe fresh air for six hours per week is insufficient to constitute a violation of the Eighth Amendment, especially given the absence of any evidence in the record that either these Plaintiffs or other SMU-2 inmates have suffered or are at risk to suffer any injury whatsoever.

60.     Plaintiffs have also failed to make the requisite showing as to Defendants' state-of-mind.   Based on the evidence presented to the Court, Defendants could not have been deliberately indifferent to substantial risks of serious harm to Plaintiffs, as there simply is no risk of serious harm to them.   There was no evidence presented that Plaintiffs have suffered or will suffer adverse health effects by virtue of this condition of their confinement.   And the limitations that do exist on the outdoor exercise of SMU-2 inmates are motivated by either security concerns or resource constraints, not punitive intention.

**IT IS ORDERED** that judgment be entered against Plaintiff Baptisto and in favor of Defendants in the case of Isadore Baptisto v. Charles Ryan, et al. (CV-03-1393-PHX-SRB).

1    **IT IS FURTHER ORDERED** that judgment be entered against Plaintiff Diaz and

2    in favor of Defendants in the case of Christian Diaz v. Dora Schriro, et al. (CV-03-1498-

3    PHX-SRB).

4    **IT IS FURTHER ORDERED** that judgment be entered against Plaintiff Mullins and

5    in favor of Defendants in the case of T.C. Alyne Mullins v. Terry Stewart, et al. (CV-02-

6    1056-PHX-SRB).

7    DATED this 28th day of March, 2006.

_____

Susan R. Bolton
United States District Judge